**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Louis SAUZA–MARTINEZ, Defendant–Appellant.**

**No. 98–50770.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 2, 2000

Filed July 6, 2000

Jeremy Warren, San Diego, California, for the defendant-appellant.

William V. Gallo, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: WALLACE, TROTT and GOULD, Circuit Judges.

TROTT, Circuit Judge:

Louis Sauza–Martinez ("Sauza") appeals his convictions by a jury in a joint trial with codefendants Robert Burns ("Burns"), Blanca Ester Ortiz ("Ortiz"), and Rafael Leyva–Felix ("Leyva") for conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), distribution of cocaine in violation of § 841(a)(1), and aiding and abetting in violation of 18

U.S.C. § 2.[1] Sauza contends that the district court erred in refusing to sever his case from his codefendants and by admitting hearsay testimony of Ortiz into evidence against him without a limiting instruction. Sauza also appeals the sentence imposed by the district court, which totaled 360 months. This court has jurisdiction pursuant to 28 U.S.C. § 1291, and we **REVERSE** and **REMAND** to the district court for a new trial.

## BACKGROUND

Sauza and his codefendants were convicted by a jury on June 5, 1998, for conspiracy to distribute cocaine, possession of cocaine with intent to distribute, and related offenses. Sauza's arrest and indictment resulted from the following two drug transactions completed in August 1997, both of which involved surveillance by agents of the Drug Enforcement Agency ("DEA") and confidential sources hired by the government.

### A. The First Transaction

The first transaction linking Sauza to a possible cocaine conspiracy involved Burns and Mary Carrillo, a confidential source ("Carrillo"). On August 6, 1997, Carrillo informed DEA Agent Michael Hook ("Agent Hook") that Robert Burns had a buyer for fifty kilograms of cocaine, to be supplied by Carrillo to Burns. The following day, in a recorded conversation between Carrillo and Burns, Burns identified "Sauza" "like the tequila" as the buyer of the fifty kilograms. Later that same day, Burns and Carrillo met at the Doubletree Hotel in Del Mar, California to discuss the price of the cocaine to be supplied. Burns indicated in this conversation, which was also recorded, that Sauza would exchange a Mercedes 500 SL as collateral for the large amount of cocaine.

On August 11, 1997, Burns and Carrillo had another telephone conversation, during which Burns and Carrillo agreed to meet at Bennigan's restaurant. As planned, Burns and Carrillo met at Bennigan's and, after a brief time, walked to Carrillo's car. During the brief meeting, Burns informed Carrillo that he would like assistance in distributing ten kilograms of cocaine, which would be supplied by Sauza. Carrillo and Burns discussed potential prices for the cocaine as well as the possibility of selling the cocaine to people in Las Vegas. At the end of the meeting, Burns and Carrillo drove to Burns's rental car, where Burns showed Carrillo approximately one-half a kilogram of cocaine that he had in the car and gave her a .7 gram sample.

### B. The Second Transaction

The second drug transaction that led to the conspiracy and possession charges against Sauza and the other codefendants occurred on August 27, 1997. On this day, Devi Nelson, a confidential source ("Nelson") working under the direction of the DEA, arranged to purchase two kilograms of cocaine from codefendant Daniel Phillip Caserta ("Caserta").[2] At 12:30 p.m. on that afternoon, Caserta told Nelson to call him back between 1:00 p.m. and 2:00 p.m. Shortly thereafter, at approximately 12:40 p.m., DEA agents observed Leyva arrive at Caserta's home. Similarly, an hour later, DEA agents observed Ortiz arrive at Caserta's home. Within five minutes after Ortiz arrived, Ortiz and Leyva left Caserta's house in their respective vehicles and proceeded, in tandem, to La Jolla, California. Ortiz was driving a white Mercedes 500 SL. After Ortiz and Leyva departed, Caserta telephoned Nelson and informed her that Caserta's source of supply had just been at his house and would return

---

**1.** We affirm the convictions and sentences of Burns, Ortiz, and Leyva in a separate memorandum disposition filed concurrently and, thus, do not discuss any of their claims in this opinion.

**2.** Caserta pleaded guilty to conspiracy to distribute cocaine as charged in the original indictment and was not tried with the other four defendants.

with the cocaine in approximately forty-five minutes.

Subsequently, DEA agents observed Ortiz park her Mercedes in front of 547 Fern Glen Avenue in La Jolla, where Sauza was staying. Leyva waited in a nearby alley in his Honda. After several minutes, agents observed Sauza and Ortiz exit the front door of the Fern Glen residence and get into a green BMW. From here, they proceeded to the alley where Leyva was waiting. When they arrived, Ortiz got out of the BMW, entered the Honda, and proceeded directly back to Caserta's residence. Leyva and Ortiz, who was carrying a large black purse, entered Caserta's residence and, ten minutes later, departed again in the black Honda. Almost immediately after Ortiz and Leyva left, Caserta contacted Nelson and informed her that the two kilograms of cocaine had arrived.

On this same day, at 5:30 p.m., DEA agents observed a blue Nissan Altima, driven by Burns, arrive at the Fern Glen address. Ten minutes later, Sauza and Burns began to depart from the residence in a white Mercedes 500 SL. As they began to leave, Agent Hook detained the car and informed Sauza that he was a suspect in a narcotics investigation, and that Hook was in the process of obtaining a search warrant for his home.

After Burns identified himself to Agent Hook, Hook recalled the ongoing investigation involving Carrillo and Burns, wherein Burns sought to purchase fifty kilograms of cocaine from Carrillo. Agent Hook arrested Burns and, upon conducting a search incident to the arrest, found the keys to the rented Nissan Altima that Burns had driven up to the Fern Glen residence. Agent Hook searched the Altima and found a briefcase in the trunk, which ultimately was determined to contain 1.15 kilograms of cocaine. Likewise, at Caserta's residence, agents founds approximately two kilograms of cocaine, as well as two kilograms of marijuana, .6 grams of tar heroin, and a .40 caliber pistol.

DEA agents arrested Sauza, Ortiz, Leyva, and Caserta. After being advised of, and waiving, her *Miranda* rights, Ortiz made a statement to two law enforcement agents, Mabel Reyes and Ann Blenkle. This statement is the basis for Sauza's primary claim on appeal. The agents allege that Ortiz said that "Louis"—referring to Sauza—had provided the cocaine and that there was "one more." At trial, Ortiz denied stating that "Louis" had supplied the cocaine. She testified also that the "one more" referred not to one more kilogram of cocaine, but to one more plate of drugs she saw at Caserta's home.

The government filed a four-count superseding indictment against Sauza, Burns, Leyva and Ortiz. Count one, as against all defendants, charged conspiracy to distribute a Schedule II controlled substance. Count two, against only Sauza and Burns, charged possession with intent to distribute .5 kilograms of cocaine. This charge stemmed from the cocaine Burns showed to Carrillo at Bennigan's. Count three, against only Sauza and Burns, charged intentional distribution of .7 grams of cocaine, stemming from the sample of cocaine Burns gave to Carrillo. Finally, count four, as against all defendants, charged possession with intent to distribute 1.99 kilograms of cocaine. This charge stemmed from the cocaine found at Caserta's home.

On June 5, 1998, a jury returned guilty verdicts against Sauza, Burns, Leyva, and Ortiz on all counts. On December 4, 1998, the district court sentenced Sauza as a career offender and imposed a custodial sentence of 360 months.[3] Sauza now appeals from the conviction and the sentence imposed by the district court.

---

**3.** The district court also sentenced Sauza's codefendants on this same day as follows: Burns was also sentenced as a career offender and received 360 months, Leyva received 120 months, and Ortiz received 108 months.

## DISCUSSION

Sauza's primary argument is that he was denied a fair trial by the admission without a limiting instruction of the directly incriminating post-arrest "Louis" statements made by Ortiz to Agents Reyes and Blenkle. Specifically, Sauza argues that while the post-arrest statements were admissible against Ortiz as an admission by a party-opponent under Federal Rule of Evidence 801, as to Sauza the statements were damaging inadmissible hearsay. We agree and hold that the district court's failure to give a limiting instruction at the time the directly incriminating testimony was admitted substantially affected the fairness and integrity of the judicial proceedings and ultimately deprived Sauza of a fair trial. In light of this conclusion and our decision to reverse Sauza's conviction, we do not reach his additional claims on appeal, including those related to the sentence imposed by the district court.

Sauza moved the district court on two distinct occasions to sever his trial from the other defendants to avoid being prejudiced by Ortiz's post-arrest statements. Sauza's first motion to sever was heard before trial began. In this motion, Sauza asserted that the admission of Ortiz's post-arrest statements would violate his rights under the Confrontation Clause, as set out by the Supreme Court in *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* held that, even with an appropriate limiting instruction, the admission of a confession of a *non-testifying* codefendant violates a defendant's confrontation rights under the Sixth Amendment. *Id.* The district court denied Sauza's first request to sever, noting that "[t]he government responds that it will seek an appropriate limiting instruction and that it will redact any reference to Sauza in [Ortiz's] statements. Under these circumstances, there are no grounds for severance." As promised, when Agent Reyes testified for the government in its case-in-chief, she told the jury about Ortiz's post-arrest statements, but substitut-

ed "another person" for the name "Louis" when relating what Ortiz stated regarding who had supplied the cocaine.

Sauza made his second motion to sever at the close of the government's case. In this motion, Sauza argued that, although there would be no Confrontation Clause violation because it appeared that Ortiz would testify, *see Nelson v. O'Neil*, 402 U.S. 622, 629–30, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), the court must nevertheless sever Sauza's trial because of the prejudice he would suffer from Ortiz's statements, which would not be admissible against him in a separate trial. The district court denied the motion without explanation.

As Sauza anticipated, Ortiz then testified in her own defense. On direct, Ortiz testified that she went to Sauza's house because Sauza was trying to sell her car on her behalf. Ortiz also explained that she went to Caserta's house to meet up with Leyva so that she and Leyva could take her car to Sauza's house. Toward the end of Ortiz's direct-examination, Ortiz's counsel asked whether Ortiz had told Blenkle that "Louis had provided one of the packages of cocaine." Ortiz denied making the statement.

On cross-examination, and in order to discredit Ortiz's testimony, counsel for the government asked Ortiz whether she told Agents Blenkle and Reyes that "Louis" supplied her with cocaine. Ortiz again denied having ever made this statement and testified that, "I never said that ... I deny [the statement] because I never said it." Sauza's counsel did not object to these questions by Ortiz's counsel or the government, nor did he request a limiting instruction that the jury only consider the evidence against Ortiz. In addition, contrary to its initial promise before trial, the government did not request a limiting instruction, and the district court did not give such an instruction *sua sponte*.

Subsequently, in the government's rebuttal case, Agent Blenkle testified to impeach Ortiz. Blenkle stated that Ortiz had

indeed told her that "Louis" provided the cocaine and that there was "one more." Again, Sauza's counsel did not object to the question or answer, and neither Sauza's counsel nor the government requested a limiting instruction. No limiting instruction was given by the court.

Prior to closing arguments, the district court reviewed with counsel the jury instructions it intended to give. While Sauza's counsel submitted an instruction, citing *O'Neil*, to the effect that the admissions of one defendant should not be used against another defendant, the district court refused to give this instruction. The government did not join in Sauza's proposed instruction, nor did it remind the court that it had promised to give a similar limiting instruction during trial, but had failed to do so.

■■■■■ As an initial matter, the government argues that we may review only for plain error, because Sauza forfeited the issue by not objecting to the lack of a limiting instruction when the testimony of Ortiz and Blenkle was admitted into evidence, or when faced with the district court's refusal to include the instruction with those to be given after closing arguments. We agree with the government. While an argument can be made that the high hurdle of plain error should not apply where the government specifically stated it would offer a limiting instruction, but failed to do so, counsel for Sauza had an independent obligation to protect the rights of his client and should have objected on one of his many opportunities. *See United States v. Olano*, 507 U.S. 725, 730, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (noting the familiar principle that a constitutional right or "right of any sort" may be forfeited in criminal as well as civil cases by the failure to make a timely assertion of the right). Because counsel did not object, we review Sauza's claim for plain error and will use our discretion to reverse the conviction only if there is an error that was "clear under current law" and affected Sauza's substantial rights such that it "ser-

iously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Armijo*, 5 F.3d 1229, 1232 (9th Cir.1993) (citing *Olano*, 507 U.S. at 736–37, 113 S.Ct. 1770).

We now turn to the merits of Sauza's appeal. To begin, in *Bruton*, as well as in many subsequent cases, the Supreme Court has made clear that in joint trials, "evidence that is probative of a defendant's guilt but technically admissible only against a codefendant ... might produce a risk of prejudice." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *see also Lilly v. Virginia*, 527 U.S. 116, 131, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) ("[W]e have over the years spoken with one voice in declaring presumptively unreliable accomplices'·confessions that incriminate defendants.") (internal quotations and citations omitted). As noted above, *Bruton* is not directly applicable because its holding was premised on the Confrontation Clause and a defendant's inability to cross-examine a *nontestifying* codefendant. Here, Ortiz testified in her own defense and, thus, Sauza's confrontation rights were not implicated.

■■■■ Instead, Sauza's case falls within the shadow of *O'Neil*, where the Supreme Court dealt with a situation where "a codefendant [took] the stand in his own defense, denie[d] making an alleged out-of-court statement implicating the defendant, and proceed[ed] to testify favorably to the defendant concerning the underlying facts." *O'Neil*, 402 U.S. at 629–30, 91 S.Ct. 1723. The Court held under these circumstances that "the defendant [was] denied no rights protected by the Sixth and Fourteenth Amendments." *Id.* Here, as in *O'Neil*, Ortiz testified, was available for cross-examination, explicitly denied making the statements which implicated Sauza, and provided testimony that was favorable to Sauza's defense.

The distinguishing factor between Sauza's case and O'Neil's was that the district

court here did not provide a limiting instruction. The trial court in *O'Neil* instructed the jury that it must not consider any part of the codefendant's out-of-court confession in deciding whether or not O'Neil was guilty, *id.* at 626, 91 S.Ct. 1723, and both the Supreme Court and this court have made very clear that limiting instructions are necessary to reduce the prejudicial effect of joinder. *See Zafiro,* 506 U.S. at 539, 113 S.Ct. 933 (noting that limiting instructions will often suffice to cure any risk of prejudice in joint trials); *Armijo,* 5 F.3d at 1233 (holding that, although conviction need not be reversed, court erred by failing to give a limiting instruction informing the jury that evidence of a witness' prior inconsistent statement could be used only to impeach the witness' character for truthfulness and could not be used as evidence of Armijo's guilt); *United States v. Vasquez–Velasco,* 15 F.3d 833, 846 (9th Cir.1994) (noting the central importance of determining whether the trial judge diligently instructed the jury on the purpose of the various types of evidence); *United States v. Sherlock,* 962 F.2d 1349, 1362 (9th Cir.1989) (holding that where the court failed to instruct the jury after the prosecutor improperly referred to an excluded portion of codefendant's confession during closing arguments, the defendant was "significantly prejudiced" and entitled to a new trial); *United States v. Vaccaro,* 816 F.2d 443, 449 (9th Cir.1987) ("The prejudice of a joint trial must be such as to violate a defendant's fair rights: i.e., ... [the] failure to instruct the jury properly on the admissibility of evidence as to each defendant."), *abrogated on other grounds, Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

Under this clear precedent, particularly the *Armijo* case, there is no question that the district court erred in not giving a limiting instruction to the jury. This error was plain. Ortiz's post-arrest statements were admissible as substantive evidence against her under Federal Rule of Evidence 801(d)(2)(A) as an admission of a party-opponent, as well to impeach her denial of the statements; but, Ortiz's statements were damaging hearsay as to Sauza and were not admissible against him as substantive evidence under *any* theory. The trial court had no alternative but to so instruct the jury.

The district court's error in this case was most likely occasioned by the government's failure to offer the limiting instruction it had promised to give, and by Sauza's failure to object to admission of the evidence without such an instruction. We do not attribute any malice to the government for its failure to offer the instruction and have no evidence to doubt its explanation proffered at oral argument that the instruction was mistakenly overlooked. Nevertheless, in light of both defense counsel's and the government's utter failure to protect Sauza from the prejudicial spillover of Ortiz's statements, the district court was obligated to offer a limiting instruction *sua sponte* when the directly incriminating testimony was admitted—i.e., during both Ortiz's and Blenkle's testimony. *See Armijo,* 5 F.3d at 1233. The district court was also obligated to include an appropriate instruction in its final charge to the jury following closing arguments.

Given that the district court did not properly instruct the jury, the question that remains in our "plain error" review is whether Sauza's substantial rights were affected by the court's error. *See Olano,* 507 U.S. at 736–37, 113 S.Ct. 1770. Our thorough review of the record, including the entire universe of trial testimony and closing arguments, convinces us that they were. In *Armijo,* this court concluded that, despite the district court's failure to give an instruction to the jury limiting the use of one codefendant's hearsay statements against another in a joint trial, the conviction would stand because there was overwhelming evidence of Armijo's guilt. 5 F.3d at 1233. The same cannot be said here.

The quantum of proof offered by the government against Sauza at trial was by no means overwhelming. Ortiz's post-arrest statement that "Louis provided the cocaine" was integral to the government's argument that Sauza was the hub of the conspiracy and supplied cocaine to his spokes, Burns, Ortiz, and Leyva. Indeed, the government seized upon this hearsay testimony in its closing argument when it emphasized that there was direct evidence from the defendants themselves regarding who was involved in the conspiracy. The government reminded the jury of Ortiz's statements with the following damaging summary:

> We also have Ortiz's own statements, the statements that she made after she was arrested to Agents Blenkle and Reyes. There was a few of them. She disputes them, but the few statements that she makes that I will reference at this point in time, she says in response to a direct question from Agent Blenkle after she was advised of her rights and after she was advised why she was under arrest ... who provided the cocaine, who gave you the cocaine? *Louis provided the cocaine. Louis provided it. There was only one Louis involved in this case* unless ... Mr. Sauza's an unlucky individual who just happened to share the name with some other Louis out there can only be referring to one individual.

(Emphasis added). It is difficult to imagine a scenario in which this statement by the government would not severely prejudice Sauza. This prejudice is compounded by the fact that, had the government offered a limiting instruction as promised, it would not have been able to use Ortiz's statements against Sauza in this highly incriminating manner. We must hold the government to a higher standard.

Moreover, unlike in *Armijo* and *O'Neil*, in addition to the incriminating testimony of a codefendant, in this case there was the further testimony of Agent Blenkle in the government's rebuttal case. Blenkle's tes-timony served to reaffirm Ortiz's post-arrest statements and again bring the incriminating evidence to the ears of the jury. Blenkle's testimony also likely served to neutralize the possible benefit to Sauza from Ortiz's denial that she ever made the post-arrest statements.

Under these circumstances, where (1) the government failed to request a limiting instruction which it promised to offer and none was given by the district court, (2) the evidence produced against Sauza was by no means conclusive, and (3) the jury was persuasively reminded of the directly incriminating hearsay by the government during its closing argument, we must conclude that the fairness and integrity of Sauza's trial was substantially affected such that his conviction must be reversed. Although we give the government the benefit of the doubt that its failure to offer the limiting instruction was an oversight, we cannot ignore the severe prejudice to Sauza resulting from the admission of the damaging testimony of Ortiz and Agent Blenkle without proper guidance for the jury. Sauza is entitled to a new trial. Accordingly, we **REVERSE** AND **REMAND** to the district court for such further proceedings.