# United States Court of Appeals
## For the First Circuit

No. 01-1650

UNITED STATES OF AMERICA,

Appellee,

v.

VICTOR LEBRÓN-CEPEDA,

Defendant, Appellant

No. 00-2293

UNITED STATES OF AMERICA,

Appellee

v.

JOSE R. CARABALLO-GONZALEZ,

Defendant, Appellant

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Lynch and Howard, Circuit Judges,
and Shadur,* Senior District Judge.

Marlene Aponte Cabrera, for appellant Victor Lebrón Cepeda.
Rachel Brill, for appellant Jose Ramon Caraballo-Gonzalez.
Thomas F. Klumper, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco, Assistant United States Attorney, Criminal Division, and Daniel Vaccaro, Assistant United States Attorney, were on brief for appellee.

———————————

March 31, 2003

———————————

_____

*Of the Northern District of Illinois, sitting by designation.

**Per Curiam**.  At the conclusion of a twelve-day trial, a jury convicted defendants-appellants José Ramón Caraballo-Gonzalez and Victor Lebrón-Cepeda of committing and aiding and abetting each other and others in the commission of a carjacking resulting in a death, see 18 U.S.C. §§ 2119(3) and 2, and of using and carrying, and aiding and abetting each other and others in the use and carriage of, a firearm during and in relation to the carjacking, see 18 U.S.C. §§ 924(c)(1)(3) and 2.  The district court subsequently sentenced each defendant to life imprisonment for his carjacking conviction and to a statutorily mandated five-year consecutive term of imprisonment for his firearm conviction. Defendants appeal these judgments on a number of grounds.  We affirm.

## I.  Background

We start with an account of the facts of the crimes as the jury could have found them, e.g., United States v. Diaz, 285 F.3d 92, 94 (1st Cir. 2002), but defer providing certain additional information until we discuss the issues to which the information is relevant.

At about 11:40 p.m. on March 23, 1996, Iván Fontánez-Bruno, a Puerto Rico Police Department cadet, drove his 1994 Hyundai automobile into a parking lot in a park adjoining a beach in Figwort, Puerto Rico.  Daisy Torres-Muñoz, a fellow cadet whom Fontánez was dating, was seated next to him in the front passenger

-2-

seat.  Fontánez and Torres had their police-issued firearms with them.  Torres was carrying her weapon, but Fontánez had placed his in a black bag between the seats and next to the emergency brake.

As the automobile entered the lot, Torres noticed appellant Caraballo, co-defendant Harold Evans-Garcia (who was tried separately, see United States v. Evans-Garcia, No. 01-2617, (1st Cir. March 19, 2003), and a third man she never was able to identify (but whom other evidence showed to be appellant Lebrón) sitting on some nearby rocks.  The three earlier had split from a larger group of individuals (all of whom were named as co-defendants) with the shared intention of committing a carjacking. All three knew that, just prior to the carjacking, Caraballo was armed with a nickel-plated .38 caliber revolver that would be used to facilitate the contemplated carjacking.

Fontánez parked his car next to a light pole along the beach front and turned it off.  The car's windows were down. Fontánez and Torres began to talk about the driver's licenses they would need in order to drive patrol cars for the police force.  As they were talking, Torres opened her purse and, after placing her gun between her legs, set her purse down on top of it in order to retrieve her driver's license.  Periodically, Torres looked out the Hyundai's rear window at the individuals on the rocks because the way they were studying the cars in the lot aroused her suspicion.

Eventually, Torres mentioned her concern about the individuals to Fontánez and suggested that they leave. Fontánez turned to start the ignition and drive off, but was unable to do so because the three men had surrounded the car. Caraballo and Lebrón approached on the driver's side window, while Evans-Garcia approached on the passenger's side. Caraballo thrust the revolver through the window and placed it against Fontánez's head. Fontánez removed his gun from his bag, but Caraballo warned Fontánez against using it, stating that his revolver was cocked. Fontánez dropped the gun.

Caraballo, Evans-Garcia, and Lebrón pulled open the car doors and ordered Fontánez and Torres, who was concealing her gun beneath her purse, to move into the car's backseat. Fontánez and Torres complied and took seats facing each other, with Fontánez in the middle and Torres on the driver's side. Caraballo handed his revolver to Lebrón and took the wheel; Evans-Garcia picked up Fontánez's weapon and sat in the front passenger seat; Lebrón seated himself in the rear on the passenger's side and placed the revolver against Fontánez's head. After warning Lebrón to be careful because the revolver was cocked, Caraballo drove away.

At some point, Evans-Garcia accused Fontánez of being a police officer because only an officer would have a weapon like the one Fontánez had dropped. Fontánez denied being a police officer and claimed that he worked for Wells Fargo. Fontánez and Torres

begged to be released and offered to give the three assailants money and to drop them off wherever they wanted. One or more of the assailants replied to the effect that Fontánez and Torres would not be released and should know that they were "on [their] way to the cemetery."[1] The three also robbed Fontánez and Torres of money and jewelry but were dissatisfied with what they found. Lebrón returned Torres's jewelry to her.

Shortly thereafter, under the guise of putting on her sandals, Torres placed her gun under the seat in front of her in a place where she could grab it should the need arise and the opportunity present itself. After she sat back up, Torres placed one of her feet on top of the gun. But almost immediately, Caraballo drove the car into something that caused one of its bumpers to become detached and to be dragged along the ground. The impact caused Torres to inadvertently kick the gun to a spot beyond her reach. Moments later, apparently after discovering something that identified Fontánez as a police officer, Evans-Garcia yelled, "I told you. I told you that this son of a bitch was a cop."

---

[1]In her direct testimony, Torres testified that Caraballo and Lebrón made this remark. But on cross-examination, Torres testified that Evans-Garcia made the statement. The government has taken the position that Evans-Garcia made the statement but has neither acknowledged the inconsistency nor explained why we should adopt its reading of the record. Compare Evans-Garcia, No. 01-2617, slip op. at 3 (recounting that, at Evans-Garcia's trial, the evidence suggested that Evans-Garcia had made the "cemetery" comment).

Lebrón immediately shot Fontánez once in the head, and Evans-Garcia turned around and shot him seven more times.

Following the shooting, Caraballo made a U-turn and stopped the car. He and Lebrón exited and pulled the rear bumper completely free from the chassis, removed Fontánez's body, and dumped it on the road next to the car. Evans-Garcia pulled Torres from the car by her hair and, after a brief argument among the carjackers about whether to kill her as well, Lebrón told her to run. Torres jumped over a barrier next to the road and watched as the car drove off. Torres then ran to a nearby business and persuaded a patron to call the police. A patrol car arrived almost immediately. Torres gave one of the responding officers a description of the Hyundai and a brief description of its occupants. She also made the officer aware of the direction in which the car had departed. The officer communicated this information to other police officers via his police radio.

At about 12:15 a.m. on March 24, 1996, Carlos Martinez-Rivera, a marshal in the Puerto Rico court system, observed a red car with a missing bumper come to an abrupt stop in front of him. He saw Caraballo, Evans-Garcia, and a third man whom he was not able to identify (but whom other evidence showed to be Lebrón) exit the vehicle and walk quickly in the direction of a nearby housing project. Regarding what he had seen as suspicious, Martinez went to his nearby residence and called the police. He learned about

-6-

the carjacking and murder.  Martinez returned to the red car and gave a police officer who arrived at the scene a description of its occupants.  He also pointed out the housing project towards which they had been headed.  The officer passed the information along to other officers.  A short time later, the police arrested Caraballo and Evans-Garcia at the housing project.  Lebrón escaped arrest that night and fled to New York, where he was apprehended on April 13, 1997.

## II.  Discussion

Caraballo and Lebrón together challenge the sufficiency of the evidence underlying their carjacking convictions and, by extension, the sufficiency of the evidence underlying their firearms convictions.  Caraballo alternatively argues that his convictions were tainted by the district court's erroneous admission of out-of-court and in-court identifications of him by witnesses Torres and Martinez; by the court's plainly erroneous admission under Fed. R. Evid. 801(d)(2)(A) of certain out-of-court statements of Lebrón which tended to inculpate Caraballo; and by the court's denial of his motion for a mistrial when a witness testified that Lebrón had told him that Caraballo shot Fontánez. Lebrón alternatively contends that the court erred in applying the first degree murder cross reference specified in U.S.S.G. § 2B3.1(c)(1); in declining to award him a role-in-the-offense downward adjustment; in computing his criminal history category;

and in declining to order that his court-appointed trial counsel be reimbursed for expenses incurred in flying a court-authorized defense witness from Washington, D.C. to Puerto Rico in order to testify at trial. We address each of these arguments in turn.

## A. Sufficiency Arguments

Caraballo and Lebrón together assert that the evidence was insufficient to support the jury's determination that they had the <u>mens</u> <u>rea</u> required by 18 U.S.C. § 2119.[2] Relying upon a portion of the penultimate sentence of <u>Holloway</u> v. <u>United States</u>, 526 U.S. 1, 12 (1999) ("The intent requirement of § 2119 is satisfied when the Government proves that <u>at</u> <u>the</u> <u>moment</u> <u>the</u> <u>defendant</u> <u>demanded</u> <u>or</u> <u>took</u> <u>control</u> <u>over</u> <u>the</u> <u>driver's</u> <u>automobile</u> the defendant possessed the intent to seriously harm or kill the driver . . . .") (emphasis

---

[2]The federal carjacking statute states:

Whoever, with the intent to cause death or serious bodily harm[,] takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall --

    **(1)** be fined under this title or imprisoned not more than 15 years, or both,

    **(2)** if serious bodily injury [defined in a different statute] results, be fined under this title or imprisoned not more than 25 years, or both, and

    **(3)** if death results, be fined under this title, or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C. § 2119.

-8-

supplied), they say that the evidence was inadequate to ground a finding that they were prepared to seriously harm or kill Fontánez prior to learning that he was a police officer -- which happened only _after_ they had taken control of his automobile. The government's response is built from the remainder of the sentence appellants quote, which says that a _conditional_ intent to seriously harm or kill the driver "if necessary to steal the car" is sufficient to satisfy the statute. Id. In the government's view, the evidence was adequate to support a determination that appellants were prepared to seriously harm or kill Fontánez in the beach parking lot had he resisted their initial demand for his car.

The evidence that Caraballo placed a loaded and cocked revolver against Fontánez's head at the inception of the carjacking and verbally threatened him permitted the jury to infer that Caraballo would have shot Fontánez had Fontánez failed to comply with Caraballo's demand that he turn over the car. See Evans-Garcia, slip op. at 8; cf., e.g., United States v. Adams, 265 F.3d 420, 424 (6th Cir. 2001) (evidence sufficient to support intent finding where the defendant threatened and then physically touched the victims with his gun); United States v. Lake, 150 F.3d 269, 272 (3d Cir. 1998) (evidence sufficient to support intent finding where defendant placed a gun near the head of the victim and asked for her keys). Moreover, the evidence that Lebrón willfully and knowingly participated in the initiation of the carjacking while

fully cognizant of how Caraballo intended to (and did in fact) use the revolver permitted the jury to draw the same inference as to him. See Evans-Garcia, slip op. at 8. Because the evidence was sufficient to permit the jury to draw these inferences, it was adequate to ground its determination that appellants took the vehicle with the required mens rea. See id.; see also Holloway, 526 U.S. at 12.[3]

In his brief, Lebrón makes an additional sufficiency argument. Lebrón starts by asserting that the evidence pertaining to his role in the offense derived solely from out-of-court, post-offense confessions he made to a number of third parties, which the third parties recounted to the jury (and which were admissible against Lebrón as admissions under Fed. R. Evid. 801(d)(2)). Building from this base, Lebrón contends that the accounts of his various confessions that the jury heard so conflicted with one another that we should treat them as inadequate to sustain his

---

[3]Caraballo makes related arguments that, in instructing the jury, the district court erred in failing (1) to emphasize the need for a nexus between the taking and the intended harm at the precise moment the vehicle was relinquished, and (2) to specify that a conditional intent to seriously harm or kill is sufficient to satisfy the statute's mens rea requirement. Caraballo's first argument fails because the instructions simply tracked the language of 18 U.S.C. § 2119, which is itself adequate to put the jury on notice of the required nexus. See id. (stating that the unlawful taking or attempted taking must be committed "with" the specified intent). His second challenge fails because he did not object to the absence of a conditional intent instruction, and because he has not explained how the absence of such an instruction might have affected his substantial rights. See United States v. Olano, 517 U.S. 725, 735 (1993).

conviction. In pressing this claim, Lebrón invokes "[t]he general rule that a jury cannot rely on an extrajudicial, post-offense confession, even when voluntary, in the absence of 'substantial independent evidence which would tend to establish the trustworthiness of the statement.'" United States v. Singleterry, 29 F.3d 733, 737 (1st Cir. 1994) (brackets omitted) (quoting Opper v. United States, 348 U.S. 84, 93 (1954)). The argument fails for several reasons.

First, if Lebrón understands the trustworthiness requirement to apply where the issue is the credibility of witnesses' testimony about an accused's confession -- and not the credibility of the confession itself -- he is mistaken. The trustworthiness requirement is imposed out of concern that people sometimes fabricate stories about their involvement in a crime, and accordingly requires the government to introduce evidence other than the confession which tends to prove that the confession was not such a fabrication. See id. at 736-37 & n.3. But to the extent that the in-court testimony about an extra-judicial confession may be unreliable, that is a matter for cross examination. Second, this circuit has not decided whether the trustworthiness requirement constitutes grounds for launching a sufficiency challenge (as Lebrón has done) or acts merely as a rule governing the admissibility of evidence. See id. at 737-39 & nn.4-6. Finally, and perhaps most importantly, Lebrón is wrong in

-11-

stating that there was no evidence against him except that derived from what he told third parties about his role in the crime. Among other things, Torres's testimony about the tragic events that transpired in Fontánez's Hyundai constituted independent proof of the commission of the charged offense and was more than sufficient to establish the trustworthiness of Lebrón's confessions within the meaning of the rule he cites. See id. at 737 & n.2.

**B.  Caraballo's Alternative Arguments**

1.  Identification Evidence

Martinez arrived at the scene of Caraballo's arrest within minutes of its occurrence and, without a request from the arresting officers, identified him as one of the three men about whom he had telephoned the police. Torres identified Caraballo in a photo spread of six photographs held on April 4, 1996, one and one-half weeks after the carjacking. Prior to trial, Caraballo moved both to suppress these out-of-court identifications (usually admissible under Fed. R. Evid. 801(d)(1)(C)) and to prohibit Torres and Martinez from identifying him in court. Caraballo argued that the procedures by which the identifications were procured were impermissibly suggestive, and that the suggestiveness was such that there was a very substantial likelihood of irreparable misidentification. See United States v. Simmons, 390 U.S. 377, 384 (1968) (setting forth the two-part standard under which the appropriateness of suppression is to be judged). In support of his

-12-

motion, Caraballo pointed out that Martinez saw Caraballo handcuffed and sitting in a police cruiser prior to identifying him. Caraballo also introduced evidence tending to show that Torres saw Caraballo in a holding cell when she was brought to the same police station at which he was being detained a few hours after the carjacking (a sighting which Torres denied).

Following a five-day hearing, the district court issued a written order denying Caraballo's motion. Applying the inquiry mandated by Simmons, the court first held that the procedures that the police employed were not impermissibly suggestive. With respect to Martinez, the court found that the police did not use suggestive procedures "because [Martinez's identification of Caraballo] was contemporaneous with the events that the witness had seen only a few minutes before and because it was precisely the information that he provided to the police that led to [Caraballo's] arrest." As to Torres, the court implicitly credited Torres's testimony and found that she did not see Caraballo in a holding cell prior to identifying him in the photo spread.

On appeal, Caraballo asserts that "there can be no question" that the district court erred in concluding that the circumstances under which Martinez identified Caraballo were unduly suggestive. But this ipse dixit is neither elaborated nor bolstered by citation to applicable authority. Mindful that a court is to withhold identification evidence from the jury only in

-13-

"extraordinary circumstances," United States v. de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993) (citation and internal quotation marks omitted); see also United States v. Maguire, 918 F.2d 254, 263-64 (1st Cir. 1990) (emphasizing that the suggestiveness of an identification procedure is a proper subject of cross examination and that the jury is usually competent to weigh intelligently questionable identification testimony) (citing Manson v. Brathwaite, 432 U.S. 98, 116 (1977)), this assertion is inadequate to put the court's conclusion into issue, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). At any rate, our independent review of the matter satisfies us that the court permissibly allowed the jury to hear about Martinez's identification of Caraballo.

With respect to Torres, Caraballo essentially contends that the evidence that Torres saw Caraballo in a holding cell a few hours after the carjacking was so powerful that the district court erred in crediting the accuracy of Torres's contrary testimony. We uphold a denial of a motion to suppress if any reasonable view of the evidence supports the denial. See United States v. Watson, 76 F.3d 4, 6 (1st Cir. 1996). As an appellate court, we lack the competence and authority to second-guess the court's decision to credit Torres. See, e.g., United States v. Laine, 270 F.3d 71, 75

(1st Cir. 2001).  And in any event, as with Martinez, our independent review of the issue leads us to conclude that the court reasonably allowed Torres's identification of Caraballo to go the jury.

### 2.  Prejudicial Spillover from the Case against Lebrón

As set forth above, the jury heard several witnesses recount the details of admissions Lebrón made to them about his role in the carjacking.  Caraballo did not seek a severance of his trial or a limiting instruction informing the jury that these admissions were not to be considered against him.  Caraballo now contends that the admissions described facts so similar to those for which he was on trial that the district court's failure to sever his trial from Lebrón's or to give the jury a limiting instruction amounted to plain error within the meaning of Fed. R. Crim. P. 52(b).  Caraballo analogizes his plight to that of the accused in United States v. Sauza-Martinez, 217 F.3d 754 (9th Cir. 2000), which found plain error in a trial court's failure to give a limiting instruction at the time it admitted evidence regarding an extra-judicial statement by the accused's co-defendant that directly implicated both the co-defendant and the accused. See id. at 759-61.  Caraballo also complains that the court erred in denying his motion for a mistrial when one of these witnesses testified that Lebrón told him that Caraballo (and not Lebrón) had shot Fontánez.

-15-

While it would be most unusual for us to find that a district court erred in failing to give a limiting instruction that was never requested, we shall assume solely for the sake of argument that the court should have instructed the jury <u>sua sponte</u> that Lebrón's admissions were not to be considered against Caraballo. Even so, the hurdle set by Fed. R. Crim. P. 52(b) is high. <u>See</u> <u>Olano</u>, 507 U.S. at 732-37. And here, Caraballo has fallen far short of demonstrating that any error was of a type subject to correction under Rule 52(b).

There never was any doubt that three men participated in the carjacking and killing at the heart of this case. The case against Caraballo thus did not turn on what happened; it largely turned on whether the government had proved beyond a reasonable doubt that Caraballo was one of the three men who committed these crimes. In the end, the jury almost certainly credited Torres's testimony that Caraballo was one of the three men, and Martinez's testimony that Caraballo was one of the three men whom he saw exit Fontánez's Hyundai shortly after the carjacking. Lebrón's admissions -- which with the exception discussed below never identified Caraballo as one of Lebrón's co-perpetrators (which distinguishes Caraballo's situation from that of the defendant in <u>Sauza-Martinez</u>, <u>see</u> 217 F.3d at 761) -- almost certainly had no bearing on the jury's decision to credit this testimony. The

absence of a limiting instruction thus did not affect Caraballo's substantial rights.  See Olano, 507 U.S. at 735.

By contrast, the testimony that spurred Caraballo's motion for a mistrial did identify Caraballo as one of Lebrón's co-perpetrators.  But as we have recently explained:  "When a witness strays into forbidden territory, the usual remedy is to strike the wayward remark and instruct the jury to disregard it. . . .  In all but the rare case, that remedy, if properly executed, will suffice to safeguard the aggrieved party's rights."  United States v. Lee, 317 F.3d 26, 35 (1st Cir. 2003).  Here, as in Lee, the district court promptly struck the testimony and instructed the jury to ignore it.  And here, as in Lee, the court's refusal to order a mistrial was within its discretion.  See id.  Factors similar to those mentioned by the Lee panel in support of its ruling guide our analysis.

First, the witness's reference to Caraballo was largely cumulative of Torres's far more direct and damning testimony that Caraballo was one of the carjackers and Martinez's testimony that Caraballo was one of the men who exited Fontánez's Hyundai.  See id.  True, Torres did not identify Caraballo as a shooter, as did the witness.  But from the jury's perspective, the identities of the shooters were immaterial to whether they were guilty of the carjacking and weapons charges for which they were indicted.  Second, the remark appears to have been entirely accidental and was

-17-

in no way invited by improper government questioning.  See id. Third, the district court quickly struck the remark and told the jury to disregard it in language with which Caraballo has never taken issue.  See id.  Finally, the record provides no reason for us to disregard the presumption that jurors follow their instructions.  See id.  In sum, here (as in Lee), the errant comment, while unfortunate, was not a difference maker.

## C.  Lebrón's Alternative Arguments

Lebrón's alternative arguments do not require extended discussion.  His first argument is that the district court erred in applying the first degree murder cross reference set forth at U.S.S.G. § 2B3.1(c).  This guideline directs the sentencing judge to apply the guideline for first degree murder, U.S.S.G. § 2A1.1 (setting a base offense level of 43, which requires a life sentence irrespective of defendant's criminal history), "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States . . . ."  Section 1111, in turn, defines murder to include, inter alia, any "unlawful killing of a human being with malice aforethought . . . committed in the perpetration of . . . [a] robbery."

At page 9 of his supplemental brief, Lebrón concedes that the success of his challenge to the application of the first degree murder cross reference depends on our finding that the killing of

-18-

Fontánez did not occur during the carjacking. But the law of this circuit is that "the commission of a carjacking continues at least while the carjacker maintains control over the victim and [his or] her car." Ramirez Burgos v. United States, 313 F.3d 23, 30 n.9 (1st Cir. 2002). Obviously, the killing of Fontánez took place prior to the completion of the carjacking under this rule. Accordingly, we reject Lebrón's assignment of error and affirm the district court's application of the first degree murder cross reference.

Lebrón also contends that the district court clearly erred, see United States v. Ortiz-Santiago, 211 F.3d 146, 148-49 (1st Cir. 2000), in declining to award him a two-level reduction in his base offense level for playing a minor role in the offenses for which he was convicted, see U.S.S.G. § 3B1.2(b). In pressing this claim, Lebrón points to evidence that he refused Evans-Garcia's directive that he kill Torres, returned Torres's jewelry to her, and told her to run. Lebrón also contends that he was not the one giving orders or driving the car.

Our review of a district court's decision not to award a role-in-the-offense reduction is deferential because the decision is extremely fact-sensitive. See Ortiz-Santiago, 211 F.3d at 148. Consequently, "absent a mistake of law, battles over a defendant's status will almost always be won or lost in the district court." Id. Here, we see no mistake of law or clear error in the district

court's judgment that, with respect to the offenses of conviction, Lebrón was not a minor participant.  There was evidence that Lebrón was the one who proposed the carjacking, secured the revolver used to take the car, held the revolver to Fontánez's head after possession of the car was wrested from Fontánez, shot Fontánez in the head at point-blank range, and ultimately decided that Torres would be spared.  In view of these facts, Lebrón's assertion of clear error borders on the specious.

Lebrón next asserts, with neither meaningful elaboration nor citation to authority, that the district court erred in counting certain juvenile offenses in his criminal record while calculating his criminal history category (which was determined to be III).  In so doing, Lebrón posits a conflict between U.S.S.G. § 4A1.2(c)(2) (which excepts from the criminal history calculation, inter alia, sentences for juvenile status offenses and truancy) and § 4A1.2(d) (which specifies how certain offenses committed prior to the age of eighteen are to be counted under the guideline for computing the defendant's criminal history category, U.S.S.G. § 4A1.1).  He says that under the rule of lenity, the conflict should be resolved against counting his offenses.  This dubious argument is so skeletally sketched that we regard it as waived.  See Zannino, 895 F.2d at 17.  In any event, because we have affirmed the court's application of the cross reference for first degree murder and its concomitant establishment of a base offense level of

43, and because we have rejected Lebrón's only claim of sentencing error that might have reduced his base offense level, Lebrón still would be subject to a life sentence even if his criminal history category were I. Thus, any error in the computation of his criminal history category was harmless. See Williams v. United States, 503 U.S. 201, 203 (1992) (making clear that erroneous sentencing determinations not having an effect on the sentence are harmless errors within the meaning of Fed. R. Crim. P. 52(a)).

Finally, Lebrón challenges the district court's rejection of his motion for reimbursement of court-authorized expert witness expenses in the amount of $388.80 advanced to a defense witness by his trial counsel. The motion was brought under the Criminal Justice Act, 18 U.S.C. § 3006A. The government, citing extra-circuit authority, responds that we lack jurisdiction to review a court's decision to reject a motion of this sort. Lebrón has not replied to the government's jurisdictional argument.

We do not address the merits of this dispute. Lebrón's notice of appeal neither specified the order rejecting his motion for reimbursement nor manifested an intention to challenge it. Accordingly, he may not now contest the propriety of that ruling. E.g., Iacobucci v. Boulter, 193 F.3d 14, 22 (1st Cir. 1999); Lehman v. Revolution Portfolio L.L.C., 166 F.3d 389, 395 (1st Cir. 1999); cf. Chamorro v. Puerto Rico Cars, Inc., 304 F.3d 1, 3-4 (1st Cir. 2002) (permitting an appeal of a judgment even though the

-21-

notice of appeal specified only the order denying reconsideration of the judgment because the notice manifested appellant's intention to challenge the underlying judgment).  That said, the record reflects that this dispute may be more a matter of miscommunication than substantive disagreement about Lebrón's counsel's entitlement to the amount she seeks.  If so, we urge the responsible parties to resolve this matter expeditiously.

### III.  Conclusion

For the reasons set forth above, we <u>affirm</u> the convictions and sentences of José Ramón Caraballo-Gonzalez and Victor Lebrón-Cepeda.

**<u>(Concurring opinion follows.</u>)**

**HOWARD**, <u>Circuit Judge</u>, **concurring**.  I join the panel's <u>per</u> <u>curiam</u> opinion in its entirety but write separately to share some additional thoughts about appellants' primary sufficiency argument, <u>see</u> <u>ante</u> at 8-9, which raises what I perceive to be a recurring issue.  I first summarize my analysis of the issue and then explain why I believe it warrants this separate opinion.

**I.**

Appellants argue that they did not violate the federal carjacking statute, 18 U.S.C. § 2119, because they did not form an intent to seriously harm or kill Fontánez (if they formed such an intent at all) until <u>after</u> they and the separately tried Evans-Garcia had initiated their crime.  In presenting this argument, appellants rely on statements in <u>Holloway</u> v. <u>United States</u>, 526 U.S. 1 (1999), suggesting that one accused of carjacking must have had the statutorily prescribed <u>mens</u> <u>rea</u> at "the moment" he demanded or took control of the driver's vehicle, <u>id.</u> at 12; <u>see</u> <u>also</u> <u>id.</u> at 6-7, 8 (using language to similar effect); <u>see</u> <u>generally</u> <u>ante</u> at 8-10 (framing and then resolving this argument).  In response, the government cites <u>Holloway</u>'s holding, that the <u>mens</u> <u>rea</u> requirement of § 2119 is met if the defendant acted with a conditional intent to seriously harm or kill the victim when he commandeered the victim's vehicle.  <u>See</u> <u>id.</u> at 12.

In so framing its response, the government does not contest the premise of appellants' argument:  that <u>Holloway</u> calls

-23-

for an assessment of their _mens_ _rea_ at the inception of the carjacking. But I do not accept appellants' premise. I do not believe that <u>Holloway</u> should be read to limit the jury's focus to the commencement of the carjacking in cases like this one which, under settled circuit precedent, involve "tak[ings]" that occur over some period of time, _see_ <u>Ramirez Burgos</u> v. <u>United States</u>, 313 F.3d 23, 30 n.9 (1st Cir. 2002) (declining to specify "the temporal limits of a carjacking under § 2119" but "reaffirm[ing] that the commission of a carjacking continues at least while the carjacker maintains control over the victim and her car"). I backtrack a bit to explain.

As set forth _ante_ at 8 n.2, the federal carjacking statute states:

> Whoever, with the intent to cause death or serious bodily harm[,] takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall --
>
> > **(1)** be fined under this title or imprisoned not more than 15 years, or both,
> >
> > **(2)** if serious bodily injury [defined in a different statute] results, be fined under this title or imprisoned not more than 25 years, or both, and
> >
> > **(3)** if death results, be fined under this title, or imprisoned for any number of

-24-

                    years up to life, or both, or
                    sentenced to death.

18 U.S.C. § 2119.  The Supreme Court has held that the statute describes three offenses with different statutory elements: (1) a carjacking (or attempted carjacking) simpliciter, § 2119(1); (2) a carjacking (or attempted carjacking) resulting in a serious bodily injury, § 2119(2); and (3) a carjacking (or attempted carjacking) resulting in a death, § 2119(3).  See Jones v. United States, 526 U.S. 227, 232-52 (1999).  The carjackings under review in Holloway did not result in a serious bodily injury or a death, and thus were the kind described in § 2119(1).  See 526 U.S. at 4.  The carjacking underlying these appeals was, by contrast, the kind described in § 2119(3).

     Many of the attempted carjackings and carjackings outlawed by § 2119(1) are entirely committed in the usually brief and frequently instantaneous period of time that it takes to initiate and complete the actus reus:  the demand (in the case of an attempted carjacking) or the taking (in the case of a successful carjacking) of the subject vehicle.  They are, in other words, crimes in which the typical actus reus is aptly thought to occur at a "moment" in time and not over a period of time.  Certainly, the carjackings at issue in Holloway were of this kind.  See 526 U.S. at 4.  Thus, it is not surprising that the Holloway majority opinion would use the phrase "the moment the defendant demanded or took control over the driver's automobile" to describe the point in

time at which the factfinder should assess the <u>mens</u> <u>rea</u> of defendants who have committed this kind of carjacking. After all, the defendant's <u>mens</u> <u>rea</u> is to be measured when he commits the <u>actus</u> <u>reus</u>. <u>See</u> 18 U.S.C. § 2119 (stating that the proscribed taking or attempted taking must be committed "with" the specified intent); <u>see</u> <u>also</u> <u>Holloway</u>, 526 U.S. at 8 ("The statute's <u>mens</u> <u>rea</u> component . . . modifies the act of 'tak[ing]' the motor vehicle.") (alteration in original).

But I do not find anything in <u>Holloway</u> to suggest that the majority in that case intended the phrase also to have prescriptive significance in those carjacking cases where the defendant kidnaps the vehicle's occupants and thus commits the <u>actus</u> <u>reus</u> not in a "moment" but rather over an extended period of time. <u>See</u> <u>Ramirez-Burgos</u>, 313 F.3d at 30 n.9 (citing <u>United States</u> v. <u>Vazquez-Rivera</u>, 135 F.3d 172, 178 (1st Cir. 1998));[4] <u>see</u> <u>also</u> <u>United States</u> v. <u>Hicks</u>, 103 F.3d 837, 843-44 & nn.4 & 5 (9th Cir. 1996) (similar); <u>cf.</u> Wayne R. LaFave, <u>Criminal Law</u>, § 8.5, at 817-18 (West 2000) (discussing the doctrine of "continuing trespass" within the law of larceny); Joshua Dressler, <u>Understanding Criminal Law</u>, § 32.07[B] (2d ed. Matthew Bender 1995) (similar). The only

---

[4]<u>Vazquez-Rivera</u> did not explicitly state that a carjacking involving a kidnaping continues at least so long as the carjacker maintains control over the victim and her car, but it implied as much when it held that a serious bodily injury sustained by a carjacking victim during a sexual assault that followed both the initial seizure of her vehicle and her kidnaping "result[ed]" from the carjacking within the meaning of 18 U.S.C. § 2119(2). <u>See</u> 135 F.3d at 178.

question presented in Holloway, as described by that case's majority, was "whether a person who points a gun at a driver, having decided to pull the trigger if the driver does not comply with a demand for the car keys, possesses the intent, at that moment, to seriously harm the driver." 526 U.S. at 6. There was no issue as to when the assailant's intent is properly measured because only one possibility presented itself under the case facts: the "moment" at which the vehicle was commandeered (which was the moment at which the actus reus was concluded). Nor did the case address matters pertaining to what we have called "the temporal limits" of a carjacking. See Ramirez Burgos, 313 F.3d at 30 n.9. Nor, finally, does the language of the carjacking statute suggest that, in circumstances such as these, the defendant's mens rea must be measured at the moment that the taking is initiated. Cf. Vazquez Rivera, 135 F.3d at 178 ("We begin by noting that there is no textual basis for asserting that the injury must be 'necessary to' or 'intended to effectuate' the taking of the vehicle itself."). There is thus no reason to suppose that, in those cases where the carjacking occurs over a period of time, Holloway circumscribes the factfinder's entitlement to assess appellants' mens rea at any point during the commission of the actus reus.

Of course, this reading of Holloway does not render it irrelevant to a case of this sort. Holloway clarifies that we may

-27-

sustain appellants' convictions if the jury rationally could have found beyond a reasonable doubt, e.g., United States v. Marrero-Ortíz, 160 F.3d 768, 772 (1st Cir. 1998), that appellants intended (even conditionally) to seriously harm or kill at the moment they first took control over the Hyundai, see 526 U.S. at 12. Indeed, I think the most persuasive reason for affirming appellant Caraballo's conviction is the "conditional intent" thesis we have identified in our opinion: The evidence that Caraballo initiated the carjacking by placing a loaded gun against Fontánez's head permitted the jury to conclude that Caraballo would have shot Fontánez had Fontánez failed to comply with Caraballo's demand that he turn over the car. See ante at 9.

But my reading of Holloway also permits us to sustain appellants' convictions if the jury rationally could have found that, at some point in time, they engaged in conduct constituting part of the actus reus proscribed by 18 U.S.C. § 2119 (or aided and abetted each other or others in doing so) with the specified mens rea, and if Fontánez's death resulted from their conduct. See § 2119(3). Cf. LaFave, supra, at 817-18 (explaining that, under the continuing trespass doctrine, formation of the requisite mens rea at any time during a continuing, blameworthy trespass is sufficient to make the trespass a larceny because, at that moment, the taking and the required intent coincide); Dressler, supra, § 32.07[B][2] (same). This straightforward ground for affirming Lebrón's

conviction doe not require asking whether the jury could have found that he had a conditional intent to seriously harm or kill Fontánez at the moment the carjackers demanded the car. In my view, we could have affirmed Lebrón's conviction simply because he intentionally shot Fontánez in the head at close range during the actus reus, thus manifesting an intention to seriously harm or kill him.

## II.

Ordinarily, I would not write separately to point out a different, and less settled, route to a result with which I concur -- especially where the route that the panel opinion travels is both entirely correct and based on established law. But there are situations where the potential costs of leaving matters unresolved exceed the costs that can be generated by attempting to resolve an open question. See Cass R. Sunstein, Foreword: Leaving Things Undecided, 110 Harv. L. Rev. 4, 15-20 (1995). I regard interpretation of the carjacking statute's mens rea requirement as such a situation, involving the possible inadvertent foreclosure of an important issue.

Defendants charged with a carjacking involving a kidnaping that results in serious bodily injury or death face extremely stiff penal sanctions. See 18 U.S.C. § 2119(2), (3). Unless and until we weigh in on whether Holloway has the meaning appellants have attached to it, such defendants will have a strong

-29-

incentive to argue that the government has failed to prove beyond a reasonable doubt that they had a conditional intent to harm or kill -- an elusive concept that is, by its very nature, difficult to prove -- at the moment they first commandeered the vehicle. District courts will thus be left to make difficult decisions whether to permit an argument of this sort, grant a Fed. R. Crim. P. 29 motion on this basis, and/or instruct the jury without authoritative circuit guidance.

If appellants' construction of <u>Holloway</u> is permitted to carry the day, it is not difficult to imagine a scenario where a carjacking defendant who has kidnaped and harmed (or killed) his victim escapes punishment under 18 U.S.C. § 2119. Imagine a carjacking in which the defendant approaches a woman as she is getting into her vehicle in a crowded parking lot, points an unloaded gun at her, tells her that he is going to commandeer her vehicle but that she will be fine if she does as she is told, drives her to some remote location, and sexually assaults her. Suppose further that, at his trial for violating § 2119(2), defendant truthfully testifies that he would have abandoned the carjacking and run off had the victim resisted, and that he only decided to assault her when the opportunity presented itself after he had taken control of her vehicle. Under appellants' reading of <u>Holloway</u>, an acquittal (not subject to appellate review) would be mandated in such a situation, despite the fact that the statutory

language of § 2119(2) easily supports a conviction (under what I believe to be this circuit's definition of the statutory term "takes a motor vehicle," see Ramirez Burgos, 313 F.3d at 30 n.9), and the fact that, as I believe, Congress would intend the statute to reach this set of facts.

It is a very small but logical step from Ramirez Burgos to the construction of 18 U.S.C. § 2119(2) and (3) that I have described. In my view, it is a step that we should take. Doing so would help to ensure against erroneous acquittals, provide clarification of the law, and facilitate guilty pleas by carjackers who kidnap and then harm their victims and who otherwise might roll the dice on trials designed to raise reasonable doubt as to whether they had the conditional intent to harm their victims at the instant they initiated their crimes.