# United States Court of Appeals
## For the First Circuit

No. 08-2110

UNITED STATES OF AMERICA,

Appellee,

v.

NELIZA FIGUEROA-CARTAGENA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Baldock,* and Lipez, Circuit Judges.

Rafael F. Castro-Lang, for appellant.
Julia M. Meconiates, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, were on brief for appellee.

July 16, 2010

* Of the Tenth Circuit, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>.** Appellant Neliza Figueroa-Cartagena ("Neliza") was found guilty of aiding and abetting a carjacking that resulted in death, 18 U.S.C. § 2119(3); conspiring to commit that carjacking, 18 U.S.C. §§ 371; and aiding and abetting the carriage or use of a firearm during the carjacking, 18 U.S.C. § 924(c)(1)(A)(ii).  She and two co-defendants, Félix Gabriel Castro-Davis ("Gabriel") and Félix Alberto Castro-Davis ("Alberto"), appealed their convictions on a number of grounds, including sufficiency of the evidence.  In a separate opinion, we affirmed the convictions of Alberto and Gabriel. <u>See</u> <u>United States</u> v. <u>Castro-Davis</u>, Nos. 08-2108, 08-2109.  In this opinion, we affirm Neliza's carjacking and conspiracy convictions and reverse her firearm conviction.[1]

**I.**

The underlying facts are set forth in detail in the companion opinion, <u>United States</u> v. <u>Castro-Davis</u>, Nos. 08-2108, 08-2109.  As we explained there, the jury could have found from the evidence presented at trial that Gabriel and Alberto carjacked Héctor Pérez-Torres on the afternoon of July 15, 2006 in Caguas, Puerto Rico.  There was no evidence presented regarding what

---

[1]    Judge Torruella dissents from the affirmance of the carjacking and conspiracy convictions. Also, in a section of this opinion not joined by Judge Baldock (Part II.C), I explain my reservations about the precedents that require, in my view, affirming the carjacking conviction, and urge en banc review to re-examine them.

happened in the immediate aftermath of the carjacking. Later that evening, Gabriel and Alberto arrived at Neliza's parents' house in Cayey with Pérez handcuffed inside his own car. Gabriel had been living at the house with Neliza, whom he was dating at the time. Although Neliza did not arrive with Gabriel and Alberto, she placed a phone call at that time to her brother José, who was inside the house, and asked him to step outside to speak with Gabriel. When José went outside, Gabriel offered him money to guard Pérez for a while. José agreed, and Gabriel and Alberto left to withdraw money using Pérez's ATM card.

While watching Pérez, José grew nervous and called Gabriel to urge him to hurry. Neliza answered the phone and assured him they were nearby.[2] Just after the conversation ended, however, Pérez jumped from the car and attempted to escape. José unsuccessfully tried to force him back into the car, and a struggle ensued until Gabriel, Alberto, and Neliza arrived and subdued Pérez. In the meantime, several neighbors approached the house to inquire about the noise. Neliza told them not to get involved, and she and Gabriel closed a gate to prevent them from approaching.

José went to a gas station after the fight to wash his car and drink a beer. Gabriel, Alberto, and Neliza followed to check on him. Neliza was driving her own car, Gabriel was driving

---

[2] It is unclear whether Neliza answered Gabriel's phone or whether José accidentally called his sister's phone.

Pérez's car, and Alberto was sitting in Pérez's car holding Pérez in a headlock. The three spoke briefly with José and then drove off in the same direction.

The next day, Neliza and Gabriel met José at the house. Gabriel explained that he and Alberto had killed Pérez the night before by asphyxiating him with duct tape.[3] Gabriel and Neliza instructed José to threaten the neighbors and tell them to remain silent about the previous day's events.

The following year, Gabriel, Alberto, and Neliza were charged with aiding and abetting a carjacking that resulted in death, 18 U.S.C. § 2119(3); conspiring to commit that carjacking, 18 U.S.C. §§ 371; and aiding and abetting the use of a firearm during the carjacking, 18 U.S.C. § 924(c)(1)(A)(ii). After a four-day trial, the jury returned a verdict of guilty on all counts. The district court sentenced Neliza to a total term of imprisonment of 262 months and sentenced Gabriel and Alberto to life imprisonment. This appeal followed.

## II.

On appeal, Neliza challenges the sufficiency of the evidence supporting her convictions and claims that the district court made a number of evidentiary and procedural errors that

---

[3]     The government has not alleged that Neliza was directly involved in the killing of Pérez.

-4-

entitle her to a new trial. We address each of her arguments in turn, beginning with the sufficiency of the evidence.

We review de novo the district court's denial of Neliza's motion for judgment of acquittal. United States v. Thompson, 449 F.3d 267, 275 (1st Cir. 2006). Our inquiry is whether, taking the evidence in the light most favorable to the verdict, a reasonable factfinder could have found her guilty beyond a reasonable doubt. Id.

## A. Carjacking

Neliza's challenge to her carjacking conviction focuses on what we have called the "temporal limits" of the crime. Ramírez-Burgos v. United States, 313 F.3d 23, 30 n.9 (1st Cir. 2002). She claims that her involvement, if any, with Alberto and Gabriel's criminal scheme began long after those two had seized Pérez's car. In her view, there was no basis for the jury to conclude that she aided and abetted the carjacking because it is not possible to aid and abet a crime that has already been committed.[4]

The basic legal premise of her argument -- that she cannot be convicted of aiding and abetting a completed crime -- is sound. At common law, participants in a felony were divided into

---

[4] Neliza also suggests in passing that she did not have the requisite intent to commit the carjacking. She has not made any attempt to develop that argument, however, and we therefore deem it waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

four categories according to the nature and timing of their participation: "(1) first-degree principals, those who actually committed the crime in question; (2) second-degree principals, aiders and abettors present at the scene of the crime; (3) accessories before the fact, aiders and abettors who helped the principal before the basic criminal event took place; and (4) accessories after the fact, persons who helped the principal after the basic criminal event took place." Gonzales v. Duenas-Alvarez, 549 U.S. 183, 189 (2007). The enactment of the federal aiding and abetting statute in 1909 eliminated the distinctions among the first three categories. The statute now provides that any such participant "is punishable as a principal." 18 U.S.C. § 2(a); Standefer v. United States, 447 U.S. 10, 19 (1980). However, Congress chose to retain the fourth category -- accessory after the fact -- as a separate class whose "offense is distinct and is differently punished." Bollenbach v. United States, 326 U.S. 607, 611 (1946). Accessories after the fact may generally be imprisoned "not more than one-half the maximum term of imprisonment . . . prescribed for the punishment of the principal." 18 U.S.C. § 3.

The temporal boundary between principals and aiders and abettors, on the one hand, and accessories after the fact, on the other hand, thus remains important in federal criminal law. On each side of that boundary lies a separate offense with separate

-6-

elements and a separate punishment. United States v. Avants, 367 F.3d 433, 450 (5th Cir. 2004). One consequence of that enduring distinction is that "a person cannot be found guilty of aiding and abetting a crime that already has been committed." United States v. Hamilton, 334 F.3d 170, 180 (2d Cir. 2003); SEC v. Papa, 555 F.3d 31, 36 (1st Cir. 2009).

This point has important implications for Neliza's liability. To fully understand those implications, we must draw a careful distinction between the "offense" of carjacking and the offense conduct. Like many crimes, carjacking is composed of several different types of elements: the offense conduct (the taking of a motor vehicle from the person or presence of another by force and violence or by intimidation), a mental state (the intent to cause death or serious bodily harm), an attendant circumstance (the transportation of the vehicle in interstate or foreign commerce), and, for aggravated carjacking, a consequence (serious bodily injury or death).[5] For purposes of aiding and abetting liability, it is the duration of the offense conduct that matters, since the aiding and abetting statute "states a rule of criminal responsibility for acts which one assists another in performing." Nye & Nissen v. United States, 336 U.S. 613, 620 (1949) (emphasis

---

[5]    See 1 Wayne R. LaFave, Substantive Criminal Law § 6.1 (2d ed. 2003) (distinguishing between "acts," "surrounding circumstances," and "consequences"); Model Penal Code § 1.13(9) (2001) (dividing "element[s] of an offense" into three categories: "conduct," "attendant circumstances," and "result[s] of conduct").

-7-

added); see also United States v. Morales-Cartagena, 987 F.2d 849, 853 (1st Cir. 1993) ("[A]iding and abetting is a form of agency in which the law holds a defendant criminally responsible for the acts and conduct of another person even though the defendant may not have personally committed every act constituting the offense alleged.").[6]  In Neliza's case, if there is no evidence that she aided Gabriel and Alberto in their performance of the offense conduct (either before the fact or during the fact), her conviction cannot stand.  Cf. United States v. Delpit, 94 F.3d 1134, 1150-51 (8th Cir. 1996).

　　　The factual premise of Neliza's argument -- that she did not become involved until after Gabriel and Alberto seized the car -- is also sound.  The first sign of Neliza's involvement in the criminal episode was a phone call she made to her brother José on the evening of July 15, 2006, asking him to step outside the

---

　　　[6]　Although the current aiding and abetting statute obscures this point by speaking in terms of aiding the commission of an "offense," the focus on offense conduct was explicit in the former version of the statute, which provided: "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."  18 U.S.C. § 550 (1940) (emphasis added).  The current language was substituted as part of the 1948 re-codification of Title 18.  It is apparent from the Revision Notes that the change was intended to be stylistic only.  See 18 U.S.C. § 2, Revision Notes ("Section 2(a) comprises § 550 of Title 18, U.S.C., 1940 ed., without change except in minor matters of phraseology.").

house to speak with Gabriel.[7]  But the seizure of the vehicle occurred several hours earlier, in the mid- to late-afternoon. There was no evidence suggesting what Neliza might have been doing at the time of the seizure or when she became entangled in the carjacking scheme.  The government attempted to fill this gap at trial by arguing that "somebody" must have driven Alberto and Gabriel from Cayey to the scene of the carjacking in Caguas: "They didn't walk from Cayey to Salchichón in Caguas.  Somebody took them there, and that someone is Neliza Figueroa-Cartagena."[8]  But the government presented no evidence to support that theory.  Needless to say, Alberto and Gabriel could have arrived in Caguas in any number of ways, and they may have sought Neliza's aid after they seized the car.  The government's theory is pure conjecture, which cannot form the basis for a criminal conviction.[9]  United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995).

---

[7]    The precise time is a matter of dispute.  José testified that it was "getting dark" when Neliza called, which he estimated was around 6:00 p.m.  It was later pointed out that the sun sets significantly later than 6:00 p.m. during the summer in Puerto Rico.  The exact time is not critical for present purposes.

[8]    As we explain more fully in Part II.B, infra, this was not the government's only factual argument about Neliza's involvement.

[9]    Indeed, the government has made little effort to defend this theory on appeal, choosing instead to obscure the distinctions among the defendants by referring to them generically as "appellants."

It would seem to follow that Neliza's conviction cannot stand because there is insufficient evidence that she participated in the carjacking offense conduct. But that conclusion rests on a third, unstated assumption: that the offense conduct for carjacking begins and ends when the vehicle is first seized. In our circuit, at least, that is not the law. We have held that when a carjacking victim is taken hostage, "the commission of [the] carjacking continues at least while the carjacker maintains control over the victim and [his or] her car." Ramírez-Burgos, 313 F.3d at 30 n.9; accord United States v. Lebrón-Cepeda, 324 F.3d 52, 61 (1st Cir. 2003) (per curiam); United States v. Matos-Quiñones, 456 F.3d 14, 19 n.4 (1st Cir. 2006) (dictum); United States v. Martinez-Bermudez, 387 F.3d 98, 101 (1st Cir. 2004) (dictum).

That gloss on the carjacking statute casts Neliza's argument in a different light. As we have said, an individual who arrives on the scene after the offense conduct has ended cannot be held liable as an aider and abettor. But when the criminal conduct extends over a period of time, a latecomer "may be convicted of aiding and abetting even if [she] did not learn of the crime at its inception but knowingly assisted at a later stage." United States v. Reifler, 446 F.3d 65, 96 (2d Cir. 2006).

Neliza's participation fits within the latter category. Under our precedent, the carjacking offense conduct remained ongoing while Pérez was a hostage in the car for many hours after

-10-

Neliza became involved. During that time, Neliza lent significant aid to Alberto and Gabriel: she allowed them to hold Pérez at her parents' house, she helped recruit her brother as a guard, and she warded off curious neighbors. She was not "merely present" at the scene of the crime; her aid was essential to the success of the scheme, and she may therefore be held liable as an aider and abettor. United States v. Peña-Lora, 225 F.3d 17, 28-29 (1st Cir. 2000) (affirming conviction where defendant aided and abetted hostage-taking by bringing meals to the hostage and letting him out to use the restroom); see also 2 Wayne R. LaFave, Substantive Criminal Law § 13.2 (2d ed. 2003) (noting that an aider and abettor may "facilitate the crime by getting . . . [a] possible witness away from the scene").

## B. The Dissent

The dissent argues that it is a due process violation to affirm Neliza's conviction based on her conduct at the Figueroa house. We respectfully disagree. It is true that "we cannot affirm a criminal conviction on the basis of a theory not presented to the jury . . . ." Chiarella v. United States, 445 U.S. 222, 236 (1980). But that is not a problem here because the jury was specifically invited to consider Neliza's conduct at the house. The government argued in closing that Neliza should be convicted as an aider and abettor of the carjacking offense based in part on that conduct, including her phone call to José and her intervention

-11-

with the neighbors. Neliza's counsel directly engaged the government's argument in her own closing argument, questioning whether José's account of Neliza's involvement at the house was reliable. Thus, the whole range of Neliza's conduct was put before the jury. It is of no moment that the government's case rested in part on an unsupported factual assertion (i.e., that Neliza drove Alberto and Gabriel to the site where they first seized Pérez's vehicle). As the dissent acknowledges, we cannot overturn the verdict because it might have been based on a factually unsupported theory. See Santellan v. Cockrell, 271 F.3d 190, 196 (5th Cir. 2001) ("The Supreme Court has ruled that where a jury is given the option of choosing between factually adequate and factually inadequate theories of guilt, jurors 'are well equipped to analyze the evidence' and can be counted upon to base their verdict upon the factually adequate theory." (quoting Griffin v. United States, 502 U.S. 46, 59 (1991)).

Importantly, neither the indictment nor the jury instructions limited this broad focus on the entirety of Neliza's conduct. The indictment was framed in general terms that tracked the language of the carjacking statute, and the jury instruction on carjacking repeated that same language. See 18 U.S.C. § 2119 ("Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or

presence of another by force and violence or by intimidation . . . ."). The instruction on aiding and abetting, in turn, was broadly worded and suggested that the entire course of Neliza's conduct could be considered. For example, the jury was instructed that "[a] particular defendant, to be responsible under aiding and abetting, need not perform the underlying criminal act, be present when it was performed, or be aware of all the details of the execution to be guilty of aiding and abetting." The government emphasized that point in its closing argument by listing all of Neliza's conduct and asserting: "Ladies and Gentlemen, that is called aiding and abetting. She didn't have to put the tape around [Pérez's] face. She helped them. She aided and abetted them. She knew what they were doing. She was standing to benefit from it, and she is just as responsible under the law as they are."

Under the circumstances, even in the absence of an explicit jury instruction that the offense conduct of the carjacking charge continued while Pérez was held hostage in the car, the jury was presented with the theory that Neliza could be convicted of carjacking based on her conduct at the house. Neliza had ample opportunity to rebut the factual and legal basis for that theory. Ultimately, however, the jury chose to believe the government's version of the facts. Affirming on that basis therefore does not infringe Neliza's "right to be heard on the

specific charges of which [s]he is accused."  Dunn v. United States, 442 U.S. 100, 106 (1979).[10]

## C.  Reconsidering the Abduction Rule[11]

Although I disagree with the dissent's argument that Neliza's carjacking conviction cannot be affirmed under our current carjacking jurisprudence, I must acknowledge my reservations about the correctness of that jurisprudence.  The notion that the offense conduct for carjacking continues "while the carjacker maintains control over the victim and his or her car" is essential to the holding that Neliza was properly convicted as an aider and abettor. That construction of the carjacking statute, which I will refer to as the abduction rule, has been repeated in numerous cases in this

---

[10]  The dissent also raises the separate point that the government has not fully developed on appeal the argument that Neliza's conviction can be affirmed based on her conduct at the house.  We acknowledge that the government's briefing is rather unhelpful in that regard and that we could perhaps deem the argument to be abandoned or forfeited.  See United States v. Vega Molina, 407 F.3d 511, 524 (1st Cir. 2005) ("Under the circumstances of this case, we choose not to do the government's homework."). But potential forfeitures arising out of poor appellate briefing can be excused under appropriate circumstances.  See Charles A. Wright et al., Federal Practice & Procedure: Jurisdiction § 3974.1 (4th ed. 2008).  The government has invoked the relevant principles and cases, albeit in connection with the intent element rather than the offense conduct element.  We will not reverse what is otherwise a valid conviction because the government has done a poor job of writing its brief.

[11]  As already noted, Judge Baldock does not join me in this portion of the opinion.  Therefore, I must resort to the first person in describing my views.  However, as Judge Torruella makes clear in his separate opinion, he agrees with most of the analysis here.

-14-

circuit and finds support in several cases from other circuits.[12]
Nevertheless, the basis for that interpretation has never been
explained and does not appear to be firmly grounded in the
statutory text or the relevant case law.  Although the panel is
bound to apply the abduction rule here, I believe the issue would
benefit from review by the full court.  I explain my view.

### 1.  Statutory Text -- "Taking"

Neliza's liability turns on whether Gabriel and Alberto's
offense conduct continued as long as Pérez was held hostage or
whether it ended at an earlier point.  To determine whether (and
how long) offense conduct is capable of continuing, one must look
at the "the explicit language of the substantive criminal statute"
and the "nature of the crime involved."  Toussie v. United States,
397 U.S. 112, 115 (1970).  I address the statutory text in this
section, focusing on the meaning and duration of a "taking."  In
the following section, I consider the possibility that carjacking
is by "nature" a crime that is capable of continuing after the
taking has ended.

The federal carjacking statute authorizes the punishment
of any individual who,

---

[12]    See Ramírez-Burgos, 313 F.3d at 30 n.9; Lebrón-Cepeda,
324 F.3d at 61; Matos-Quiñones, 456 F.3d at 19 n.4;
Martínez-Bermudez, 387 F.3d at 101; United States v. Cline, 362
F.3d 343, 353 (6th Cir. 2004); United States v. Hicks, 103 F.3d
837, 843 & nn. 4-5 (9th Cir. 1996), overruled on other grounds by
United States v. W.R. Grace, 526 F.3d 499 (9th Cir. 2008) (en
banc).

> with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so . . . .

18 U.S.C. § 2119. At the core of the crime of carjacking is the forcible "taking" of a motor vehicle "from the person or presence of another." "Taking" (or "caption," as it was also called) is a common law term of art derived from the law of robbery and larceny. It refers to the act of "securing dominion" over something. 3 LaFave, supra, § 19.3(a); see also 3 Charles E. Torcia, Wharton's Criminal Law § 357 (15th ed. 2009) ("There is a caption when the defendant takes possession. He takes possession when he exercises dominion and control over the property."). "Taking" was distinct from "carrying away" (or "asportation"), which was a separate element and could not occur until after the property had been "taken." 3 Torcia, supra, § 357. Thus, at common law, a taking was complete once the defendant had secured initial control over the property in question.[13]

---

[13] The scope of a taking was not simply an academic matter. Because the use of force or fear had to coincide with the taking at common law, the narrow understanding of a taking significantly restricted the scope of a robbery. See William Blackstone, 4 Commentaries * 242 ("[I]f one privately steals sixpence from the person of another, and afterwards keeps it by putting him in fear, this is no robbery, for the fear is subsequent."); 4 Torcia, supra, § 463 ("At common law, . . . force or threatened force (putting a victim in fear of injury) amounts to robbery only if it is used to 'take' property from the possession of another. Force or threatened force used thereafter, in order to retain possession of

-16-

Some modern cases have adopted the view that a "taking" continues until the defendant has achieved "complete and exclusive control" over the property, which may be some time after the initial seizure. Jacobs v. United States, 861 A.2d 15, 21 (D.C. 2004), judgment and opinion vacated and reissued, 886 A.2d 510 (D.C. 2005). Under that theory, "a 'taking' is not complete -- that is to say, has not come to an end -- until the perpetrator has neutralized any immediate interference with his or her possession." State v. Mitchell, 675 S.E.2d 435, 438 (S.C. 2009) (internal citations and quotation marks omitted); see also People v. Webster, 814 P.2d 1273, 1289 (Cal. 1991) ("The act of 'taking' begins when the separation of the victim from his or her property occurs, and it continues through the forcible consummation."). A few cases have applied that theory to the federal robbery statutes, see, e.g., United States v. Martin, 749 F.2d 1514, 1518 (11th Cir. 1985) ("The 'taking' contemplated by [the federal Bank Robbery Act] is not completed until 'the possibility of the item being recovered' has ended," which "continues so long as flight occurs from the possibility of hot pursuit." (quoting United States v. Jarboe, 513 F.2d 33, 37 (8th Cir. 1975))), and some cases have used similar language in the context of the carjacking statute, see, e.g., United States v. Wright, 246 F.3d 1123, 1126 (8th Cir. 2001) ("'Taking' for purposes of section 2119 is 'the acquisition by the

---

the property taken or to facilitate escape, does not qualify.").

-17-

robber of possession, dominion or control of the property for some period of time.'" (quoting United States v. Moore, 73 F.3d 666, 669 (6th Cir. 1996)).

The Supreme Court seems to have endorsed a narrow understanding of "taking" in a leading carjacking case. In Holloway v. United States, the Court noted that the carjacking statute's "mens rea component . . . modifies the act of 'tak[ing]' the motor vehicle. It directs the factfinder's attention to the defendant's state of mind at the precise moment he demanded or took control over the car 'by force and violence or by intimidation.'" 526 U.S. 1, 8 (1999). That passage equates the "act of taking" with seizing control of the vehicle and suggests that the act occurs at a "precise moment." Of course, Holloway did not involve an extended carjacking/abduction like this case. See id. at 4 n.3 ("[T]he accomplice produced his gun and threatened, '"Get out of the car or I'll shoot."'"); see also Lebrón-Cepeda, 324 F.3d at 64 (Howard, J., concurring) (arguing that Holloway did not address "matters pertaining to what we have called 'the temporal limits' of a carjacking"). Nevertheless, it is an important data point to consider. Cf. SEC v. Rocklage, 470 F.3d 1, 7 n.3 (1st Cir. 2006) ("Even dicta in Supreme Court opinions [are] looked on with great deference.").

In any case, it is not necessary to delimit the precise scope of a taking to see that the abduction rule is not grounded on

any settled understanding of the word "taking."  Even under the broadest view, a taking ends once the victim has been subdued and the defendant's control over the vehicle is "complete."

### 2.  **Nature of Carjacking**

I noted above that certain offense conduct may be deemed to continue if "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."  Toussie, 397 U.S. at 115; see also United States v. Rodriguez-Moreno, 526 U.S. 275, 280 (1999) ("[W]e have never before held, and decline to do so here, that verbs are the sole consideration in identifying the conduct that constitutes an offense.").  It is possible, then, that the duration of a carjacking might extend beyond the initial taking if it is by "nature" a continuing offense.

The robbery case law is instructive on this point.  See Jones v. United States, 526 U.S. 227, 235 (1999) (noting that "carjacking is a type of robbery" and that "Congress modeled the federal carjacking statute on several other federal robbery statutes").  Federal and state courts have long held that the offense conduct for robbery does not end when the initial taking is complete.  Rather, the offense conduct continues until the perpetrator "has won his way to a place of temporary safety" because escape is "inherent" to the crime of robbery.  Martinez-Bermudez, 387 F.3d at 102; see also United States v. Williams, 344

-19-

F.3d 365, 372-73 (3d Cir. 2003) (collecting federal cases); United States v. Garcia-Caraveo, 586 F.3d 1230, 1235-36 (10th Cir. 2009) (collecting state cases and statutes).[14] On that theory, an accomplice can be convicted of aiding and abetting a robbery even if she participated in the escape phase only. See United States v. James, 998 F.2d 74, 80 (2d Cir. 1993).

This court adopted a similar construction of the carjacking statute in United States v. Martinez-Bermudez, 387 F.3d 98 (1st Cir. 2004). Reasoning in that case that "flight with the vehicle is inherent to the crime" of carjacking, we held that a carjacking continues at least until the perpetrator "has won his way to a place of temporary safety." Id. at 102. There is no need to question that interpretation here. It is well-grounded in the robbery case law and is consistent with familiar principles of criminal law. See United States v. DeStefano, 59 F.3d 1, 4 & n.5 (1st Cir. 1995). In any event, application of the temporary safety rule, if it applied, would not be enough to support Neliza's conviction in this case because the evidence does not suggest that she helped Alberto and Gabriel escape from the scene of the carjacking.

The California Supreme Court has broadened the temporary safety rule in a way that is relevant to this case. In People v.

---

[14] The Ninth Circuit has taken the somewhat narrower view that a robbery continues until the period of "hot pursuit" has ended. United States v. Pike, 473 F.3d 1053, 1060 (9th Cir. 2007).

Stankewitz, 51 Cal.3d 72, 81 (1990), the defendant was given the death penalty based in part on a finding that he killed the victim "during" the commission of a robbery. He challenged that finding on appeal, arguing that he had reached a place of temporary safety before the victim was killed and therefore did not kill her "during" the robbery. Id. at 101. The California Supreme Court disagreed:

> So long as he held the robbery and kidnapping victim, defendant's safety was continuously in jeopardy. At any point in the journey, at any one of the several stops the group made between the Kmart and the killing scene, in any unguarded moment, the victim might have managed to escape or signal for help. There was never a moment when defendant could reasonably be said to have reached a place of temporary safety.

Id.

Stankewitz provides what may be the best support for the view that the offense conduct for carjacking continues "while the carjacker maintains control over the victim and his or her car." As far as I am aware, however, no other jurisdiction has adopted the reasoning of Stankewitz. Even in California, the rationale of Stankewitz may not be transferable to questions of accomplice liability. See People v. Cooper, 53 Cal.3d 1158, 1169 (1991) ("[W]e decline to adopt the escape rule, applicable in the context of certain ancillary consequences of robbery, for purposes of determining aider and abettor liability.").

Finally, to the extent that the legislative history may shed light on Congress's intent, it seems that Congress was simply not thinking about extended carjacking/abductions when it enacted § 2119.  See, e.g., H.R. Rep. No. 102-851, pt. 1, at 15 (1992) ("In [an 'armed carjacking'], two or three criminals approach a car waiting at a traffic light, or stopped by means of a deliberate 'fender-bender' accident, and force the driver to turn over the keys at gunpoint."); 138 Cong. Rec. S17,958-02 (daily ed. Oct. 8, 1992) (statement of Sen. Lautenberg) ("Increasingly, thieves are using violence and intimidation to force drivers to give up their cars.").

The text of the federal Bank Robbery Act, which served as a model for the carjacking statute, reinforces this point.  That statute contains a separate provision to cover robbery/abductions:

> Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, . . . forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or if death results shall be punished by death or life imprisonment.

18 U.S.C. § 2113(e).  It would thus appear that Congress knows how to authorize the punishment of abductions when it wants to provide for it.  "That Congress failed to do so here argues forcefully that such authorization was not its intention."  Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 106 (1987).

### 3. First Circuit Precedent

The origins of the abduction rule in this circuit also raise doubts about its validity. We developed the rule in two cases: Ramírez-Burgos v. United States, 313 F.3d 23 (1st Cir. 2002) and United States v. Lebrón-Cepeda, 324 F.3d 52 (1st Cir. 2003) (per curiam). Ramírez-Burgos raised the issue of when a serious bodily injury "results" from a carjacking within the meaning of 18 U.S.C. § 2119(2). Lebrón-Cepeda raised the related issue of when a killing is "committed in the perpetration of" a carjacking for purposes of the felony murder statute, 18 U.S.C. § 1111.[15]

We decided both cases on the assumption that, to be punishable, a serious bodily injury or killing must occur while the offense conduct is still continuing. See Ramírez-Burgos, 313 F.3d at 30 (The term "results" includes "injuries that were caused by the actions of the carjacker at any time during the commission of the carjacking."); Lebrón-Cepeda, 324 F.3d at 61 ("Lebrón concedes that the success of his challenge to the application of the [felony] murder cross reference depends on our finding that the killing of Fontánez did not occur during the carjacking."). Both cases involved harms that occurred long after the vehicle had been

---

[15]     More precisely, Lebrón-Cepeda raised the issue in the context of the Sentencing Guidelines murder cross-reference, which is keyed to the murder statute. See USSG § 2B3.1(c) ("If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder).").

-23-

seized.  In explaining why those harms were properly considered in punishing the defendants, we expansively construed the carjacking statute, holding that "the commission of a carjacking continues at least while the carjacker maintains control over the victim and her car."  Ramírez-Burgos, 313 F.3d at 30 n.9.  We gave no further explanation for that statement and cited a prior First Circuit case that, on closer scrutiny, does not seem to provide the necessary support.  Id. (citing United States v. Vázquez-Rivera, 135 F.3d 172, 178 (1st Cir. 1998)).[16]

---

[16]    In Vázquez-Rivera, we held that the "if serious bodily injury results" provision is not limited to injuries that are "'necessary to' or 'intended to effectuate' the taking of the vehicle itself."  135 F.3d at 178.  Rather,

> the choice of the word "results" . . . suggests that Congress intended to cover a fairly broad range of consequences flowing from a carjacking.  Moreover, the legislative history characterized the provision as imposing the enhancement when the carjacking "involves bodily injury," which supports the view that the injuries covered are not limited to those resulting from the "taking" of a vehicle, but also include those caused by the carjacker at any point during his or her retention of the vehicle.

Id. (internal citation omitted).  Although we suggested that our discussion implicated the "temporal limits of the crime of carjacking," it is clear that we were discussing the necessary causal connection between the offense conduct and the resulting serious bodily injury.  Id.  But see Lebrón-Cepeda, 324 F.3d at 64 n.4 (Howard, J., concurring) (recognizing that Vázquez-Rivera did not "explicitly" state the abduction rule, but arguing that it "implied as much when it held that a serious bodily injury sustained by a carjacking victim during a sexual assault that followed both the initial seizure of her vehicle and her kidnaping 'result[ed]' from the carjacking").

-24-

In retrospect, Ramírez-Burgos and Lebrón-Cepeda may have rested on an erroneous premise. Cases interpreting similar criminal statutes have not taken the view that an injury or killing must happen while the offense conduct is still continuing to be punishable.

For example, of the many criminal statutes containing an "if serious bodily injury results" or "if death results" provision, I am not aware of any that have been interpreted to mean that the offense conduct must be technically ongoing at the time of the injury or death. Instead, the applicability of such provisions turns on a causation analysis. See, e.g., United States v. De La Cruz, 514 F.3d 121, 138 (1st Cir. 2008) (holding that death "results" from the use of illegally distributed drugs if the death "was caused in fact by [the decedent's] use of drugs that were distributed either by the defendant himself or by others in a conspiracy of which the defendant was a part"); United States v. Marler, 756 F.2d 206, 216 (1st Cir. 1985) (holding that death "results" from a deprivation of civil rights if the death was "a natural and foreseeable result of the improper conduct"). See generally United States v. Hatfield, 591 F.3d 945 (7th Cir. 2010). Proof that the injury or death happened while the offense conduct was continuing is neither necessary nor sufficient to show that the harm "result[ed]" from the offense.

Similarly, the felony murder rule does not require proof that the underlying felony was technically ongoing when the killing happened.  If the felony and the killing occur as part of the same criminal transaction, the defendant will usually be liable for felony murder.  See, e.g., State v. Rice, 184 S.W.3d 646, 663 (Tenn. 2006) ("The killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action.") (internal quotation marks and citations omitted); Erwin S. Barbre, What Constitutes Termination of Felony for Purpose of Felony-Murder Rule, 58 A.L.R.3d 851, § 2[a] (1974) (stating that most courts require that "the felony and homicide be part of a continuous transaction, that the homicide be incident to the felony, or that there be no break in the chain of events between the felony and the homicide").  Thus, our assumption in Lebrón-Cepeda that the defendant's challenge could succeed only if we found that "the killing of [the victim] did not occur during the carjacking" was probably inaccurate.  324 F.3d at 61 (emphasis added).

In short, it may have been unnecessary for us to develop the abduction rule in the first place.  If we had applied a causation analysis in Ramírez-Burgos and a transactional analysis in Lebrón-Cepeda, we would almost certainly have reached the same result.  A rethinking of the abduction rule will not seriously

-26-

disturb our settled precedent. Indeed, it would not affect Gabriel and Alberto's convictions in this case. They were properly convicted as principals to the carjacking, and they can be held to account for the "result[ing]" death of Pérez even if that death did not occur until after the offense conduct had ended.

### 4. Conclusion

All of these factors lead me to conclude that it is time to reconsider the abduction rule, which can lead to strange and seemingly arbitrary results. In this case, Neliza is guilty of carjacking simply because Gabriel and Alberto decided to keep Pérez in the car rather than abandon the car and hold Pérez captive in the house. See Ramírez-Burgos, 313 F.3d at 30 n.9 ("[T]he commission of a carjacking continues at least while the carjacker maintains control over the victim and her car.") (emphasis added). Moreover, to the extent the question might be close, the rule of lenity and a presumption against continuing offenses[17] might weigh in favor of a narrower interpretation of the carjacking statute.

The temporal scope of carjacking is likely to be a recurring issue in this circuit. It frequently arises in appeals involving the intent element of carjacking. See Lebrón-Cepeda, 324 F.3d at 62-66 (Howard, J., concurring). It may also have implications for venue, see Rodriguez-Moreno, 526 U.S. at 281-82;

---

[17] See Toussie, 397 U.S. at 115; id. at 135 (White, J., dissenting); United States v. Johnson, 323 U.S. 273, 278 (1945). But see United States v. Bailey, 444 U.S. 394, 413 (1980).

-27-

statutes of limitations, see Toussie, 397 U.S. at 114; ex post facto challenges, see United States v. Muñoz-Franco, 487 F.3d 25, 55 (1st Cir. 2007); and Double Jeopardy challenges, see Brown v. Ohio, 432 U.S. 161, 169-70 & n.8 (1977); Blockburger v. United States, 284 U.S. 299, 302 (1932). If we intend to adhere to an interpretation with such important consequences, we should at least provide a more fully reasoned justification for our decision.[18]

## D. Conspiracy

Neliza's challenge to her conspiracy conviction also goes to the timing of the offense. She argues that "the evidence presented at trial failed to establish that she was a member of the conspiracy when the forcible taking of the vehicle occurred."[19] However, conspiracy, like carjacking in this circuit, is often a continuing offense. Muñoz-Franco, 487 F.3d at 55 n.32. As alleged in the indictment and implicitly found by the jury, the conspiracy in this case continued at least while Pérez was held hostage. See Papa, 555 F.3d at 36 n.3 ("[A] conspiracy generally ends when the design to commit substantive misconduct ends . . . .") (quoting

---

[18] In questioning the validity of Neliza's carjacking conviction, I do not in any way minimize the seriousness of her alleged conduct. She could certainly have been held to answer for that conduct under the laws of Puerto Rico, and she might have been charged federally as an accessory after the fact like her brother José, see 18 U.S.C. § 3.

[19] She also suggests in passing that she did not have the necessary intent. As with the carjacking count, we deem her intent argument waived for lack of development. Zannino, 895 F.2d at 17.

-28-

<u>Pyramid Sec. Ltd.</u> v. <u>IB Resolution, Inc.</u>, 924 F.2d 1114, 1117-18 (D.C. Cir. 1991)).[20]

Although there is no evidence that Neliza was involved during the initial planning phase, "the government does not need to show as a precursor to a finding of guilt that a given defendant took part in all aspects of the conspiracy." <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1161, 1173 (1st Cir. 1993). The evidence of her later involvement provided a sufficient basis for the jury to infer that she knew of Alberto and Gabriel's plan, shared their common purpose, and acted to further that plan or purpose. No more was needed to sustain her conviction.

**E.  Firearm Count**

Neliza's final sufficiency of the evidence argument goes to her conviction on the firearm count. The indictment alleged that she aided and abetted Alberto and Gabriel in their use and carriage of a firearm during the carjacking.[21] To secure a

---

[20]   Of course, the duration of the conspiracy to commit carjacking is linked to the duration of the carjacking itself. We do not purport to decide what effect, if any, an abandonment of the abduction rule would have on Neliza's conspiracy conviction.

[21]   Neliza was sentenced to a mandatory minimum term of seven years under 18 U.S.C. § 924(c)(1)(A)(ii), which applies when a firearm is "brandished." It is not clear what facts justified that enhanced sentence or whether the district court even made the necessary findings before imposing it. <u>See</u> <u>Harris</u> v. <u>United States</u>, 536 U.S. 545, 556 (2002) (holding that "brandishing and discharging [are] sentencing factors to be found by the judge"). Our conclusion that the conviction cannot stand makes it unnecessary to address those issues.

conviction on that count, the government had to prove that Neliza knew "to a practical certainty" that her confederates would carry or use a firearm and that she "willingly took some step to facilitate the carrying or use." United States v. Medina-Román, 376 F.3d 1, 6 (1st Cir. 2004).

We are frankly at a loss to understand what evidence could have supported a finding of guilt under that standard. As we have said, there is no evidence that Neliza was involved in the initial seizure of the car. Moreover, while there is evidence that Alberto carried a firearm throughout the entire episode, there is no evidence that Neliza was aware of the firearm or that she took any steps to facilitate the carrying of the firearm. The government has not assisted us at all in this regard. It either overlooked Neliza's argument or chose not to respond to it.

Under the circumstances, we must conclude that there was insufficient evidence to support Neliza's conviction on the firearm count. It was unreasonable for the jury to find Neliza guilty in the absence of any proof that she knowingly facilitated the use or carriage of the firearm. See United States v. Luciano-Mosquera, 63 F.3d 1142, 1151-52 (1st Cir. 1995).

### III.

We turn now to Neliza's evidentiary and procedural arguments in support of her request for a new trial.

## A. Alberto's Phone Conversation

At trial, the government introduced the recording of a telephone conversation between Alberto and his mother:

Alberto:    Neliza is the one who's talking.

Mother:    Really?

Alberto:    I saw the sworn statement.

Mother:    Yes, the police told me.

Alberto:    Yeah?  That bitch is going to fuck us over.  We can't talk too much through here, either.

Mother:    They told me that she talked really bad -- that she was talking about . . .

Alberto:    I saw the sworn statement, that's all I have to say.  I went to court yesterday.

Neliza argues that the introduction of the phone conversation violated her rights under the Confrontation Clause, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Supreme Court's decisions in Crawford v. Washington, 541 U.S. 36 (2004), and Davis v. Washington, 547 U.S. 813 (2006), define the basic contours of the Confrontation Clause as it applies to out-of-court statements. Under those cases, "testimonial" statements may not be admitted as evidence of a defendant's guilt unless the declarant can be cross-examined on the witness stand at trial or, if the declarant is

unavailable, the defendant had a prior opportunity for cross-examination. See Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2531 (2009); Whorton v. Bockting, 549 U.S. 406, 413 (2007). Non-testimonial statements, by contrast, do not "cause the declarant to be a 'witness'" within the meaning of the Sixth Amendment and thus are "not subject to the Confrontation Clause." Davis, 547 U.S. at 821.

In multi-defendant trials like this one, an additional layer of analysis may be necessary. When the prosecution seeks to introduce a statement made by one of the defendants, the statement will typically be admissible against that defendant (the declarant), who has no constitutional right to confront himself. See United States v. Rios Ruiz, 579 F.2d 670, 676-77 (1st Cir. 1978); United States v. Brown, 441 F.3d 1330, 1359 (11th Cir. 2006); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 802.05[3][d] (2d ed. 2005). But introduction of the statement may raise confrontation problems with respect to the other defendants if the declarant exercises his right not to testify at trial.

Before Crawford and Davis were decided, the Supreme Court developed a two-tiered framework for determining admissibility when a non-testifying defendant's statement is proffered at trial. Statements that facially incriminate a co-defendant are per se inadmissible under the rule of Bruton v. United States, 391 U.S.

123 (1968).  See also Gray v. Maryland, 523 U.S. 185, 192 (1998).

By contrast, statements that incriminate a co-defendant "only when

linked with evidence introduced later at trial" can be admitted if

references to the co-defendant are redacted and the jury is

instructed not to consider the statement against any defendant

other than the declarant.  Richardson v. Marsh, 481 U.S. 200, 208,

211 (1987).  We presume in the latter situation that the jury will

follow instructions and consider the statement only for the proper

purpose (assessing the declarant's guilt) and not the improper

purpose (assessing the co-defendant's guilt).  See id. at 206-07,

211.

The Bruton/Richardson framework presupposes that the

aggrieved co-defendant has a Sixth Amendment right to confront the

declarant in the first place.  If none of the co-defendants has a

constitutional right to confront the declarant, none can complain

that his right has been denied.  It is thus necessary to view

Bruton through the lens of Crawford and Davis.  The threshold

question in every case is whether the challenged statement is

testimonial.  If it is not, the Confrontation Clause "has no

application."  Bockting, 549 U.S. at 420; see also United States v.

Johnson, 581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised

on the Confrontation Clause, the Bruton rule, like the

-33-

Confrontation Clause itself, does not apply to nontestimonial statements.").[22]

Applying these principles, we conclude that Neliza's confrontation argument is without merit. We considered the character of the phone conversation in the companion opinion, holding that the statements made by Alberto and his mother were not testimonial. See Castro-Davis, Nos. 08-2108, 08-2109. As a consequence, Neliza has no constitutional right to confront Alberto. Her claim under the Confrontation Clause, whether denominated a Crawford challenge or a Bruton challenge, must be rejected.[23] Johnson, 581 F.3d at 326.

---

[22] Accord United States v. Smalls, 605 F.3d 765, 768 n.2 (10th Cir. 2010); United States v. Avila Vargas, 570 F.3d 1004, 1008-09 (8th Cir. 2009); Thomas v. United States, 978 A.2d 1211, 1224-25 (D.C. 2009); United States v. Pike, 292 F. App'x 108, 112 (2d Cir. 2008) (summary order); 5 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 1:40 (3d ed. 2007).

[23] Of course, the phone conversation must still meet the requirements of the Federal Rules of Evidence. See Johnson, 581 at 325-26. The district court ruled that the phone conversation was hearsay but nevertheless admissible against Neliza as a statement against penal interest. See Fed. R. Evid. 804(b)(3). Neliza challenges that ruling on appeal, arguing that nothing in the phone conversation was against her (Neliza's) penal interest. That is not the relevant inquiry, however. Rule 804(b)(3) requires the district court to ask whether the statement at issue "so far tended to subject the declarant" -- in this case, Alberto -- "to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Id. (emphasis added). Neliza makes no argument on that issue, and we decline to address it without the benefit of briefing.

-34-

**B.  Gabriel's Statement**

Neliza also raises a Confrontation Clause challenge with respect to the trial testimony of FBI agent Eric Gonima.  In his testimony, Gonima recounted the details of a post-arrest interview he conducted with Gabriel.  Gabriel denied all involvement with the carjacking and killing of Pérez in the interview.  He briefly mentioned Neliza, acknowledging that she had been his girlfriend and that he knew her family, though "not very well."  Neliza argues that it was erroneous for the district court to admit the testimony without instructing the jury that Gabriel's statement could not be considered as evidence against her.  See Richardson, 481 U.S. at 211.  Because she objected at trial, we review her claim de novo. United States v. Vega Molina, 407 F.3d 511, 519 (1st Cir. 2005).

Gabriel's statement to the FBI was undoubtedly testimonial, and it therefore falls within the scope of the Confrontation Clause.  We would ordinarily ask at this point whether the statement was "inculpatory on its face" with respect to Neliza.  Id. at 520.  There is no need to undertake that inquiry here, however, because the government concedes that even if the statement was admissible, it was error to admit it without a limiting instruction.  See id. at 521 ("Supreme Court case law makes clear that the trial court ordinarily should instruct the jury that one defendant's out-of-court confession may not be used against his codefendants in a joint trial.").

-35-

Nevertheless, the government says, the district court's error was harmless beyond a reasonable doubt. We agree. The only fact about Neliza that was directly or indirectly revealed through Gabriel's statement was the existence of her relationship with Gabriel. But that relationship was already well-established through José's testimony and the testimony of neighbors. Gabriel's statement added no new information in that regard. Any error in admitting the statement without a limiting instruction was harmless beyond a reasonable doubt.

## C. **Peremptory Challenges**

Neliza criticizes the district court's procedure for exercising peremptory challenges at voir dire. Because she did not make a contemporaneous objection, we review for plain error.

Federal Rule of Criminal Procedure 24 sets forth the number of regular peremptory challenges that the parties may exercise and grants them several "additional" challenges that "may be used only to remove alternate jurors." We have interpreted the rule to mean that the district court must designate particular members of the venire as prospective alternate jurors and must limit the parties' additional challenges to that group. See United States v. González-Meléndez, 594 F.3d 28, 33 (1st Cir. 2010). The district court failed to follow that procedure in this case. Rather than separating the parties' regular strikes from their additional strikes, it required the parties to exercise all of

their strikes at once against an undifferentiated panel of prospective jurors. That was error, as the government concedes.

Nevertheless, Neliza has not shown that the error was prejudicial. See United States v. Olano, 507 U.S. 725, 735 (1993) (plain error standard generally requires the defendant to show that the error "affected the outcome of the district court proceedings"). She argues that she suffered prejudice because one of the regular jurors was excused and replaced by an alternate juror. We rejected that same argument on materially identical facts in United States v. González-Meléndez, a decision made under the Rule 52(a) harmless error standard:

> Gonzalez-Melendez . . . distinguishes [United States v. Brown, 510 F.3d 57 (1st Cir. 2007) and United States v. Flaherty, 668 F.2d 566 (1st Cir. 1981), where we found similar errors to be harmless]. Unlike in those cases, he observes, in this case an alternate juror was actually seated. Thus, he claims, prejudice is readily apparent in his case.
>
> We do not see how that conclusion follows. It is not evident that the composition of the jury would have differed had the district court adhered to Rule 24(c)(4). Moreover, even if a different venire member would have been selected as the alternate juror, there is no basis in the record for concluding that the alteration in jury composition had an injurious influence on the verdict. Therefore, we conclude that the court's error was harmless.

594 F.3d at 34.  As in González-Meléndez, there is no evidence here that the district court's error injuriously affected the outcome of the proceedings.[24]

## D.  Jury Note

Neliza's final procedural claim relates to a note sent by the jury during deliberations.  The note, which was made part of the record, stated that the jury would like to "hear again the phone conversation between [Alberto] and his mother."  The district court's minute entry from that day indicates that the note was "received and discussed with counsel," but there is no indication what action, if any, was taken in response.  The trial transcript contains no record of any proceedings involving the jury note.

Neliza argues that she was never informed of the note. Although the minute entry contradicts her assertion, she has included in the addendum to her brief an e-mail in which her trial counsel denies any knowledge about how the note was handled.  We decline Neliza's invitation to delve into this dispute on the basis of unsworn evidence that was never presented to the district court. There are various avenues available to a party who seeks to remedy a perceived omission or misstatement in the record.  See Fed. R. App. P. 10(c), (e); 16A Charles Alan Wright et al., Federal

---

[24]    This conclusion does not lessen our concern about the district court's violation of the rule applicable to the selection of alternate jurors.  In the future, the district court should scrupulously comply with Rule 24.

Practice & Procedure § 3956.4 (3d ed. 1999 & Supp. 2008). But inserting new evidence into the addendum of a brief is not one of those avenues. The e-mail is stricken from the record, and we disregard Neliza's argument because it depends on the improperly included material. See Nicholson v. Hyannis Air Serv., Inc., 580 F.3d 1116, 1128 (9th Cir. 2009).

We note that similar allegations regarding the handling of a jury note were made in González-Meléndez, which was tried by different attorneys before the same district court judge. In that case, as here, the trial transcript contained no record of any proceedings relating to the jury note. Because this issue may recur, we emphasize again that proceedings in response to a jury note should be conducted on the record. See United States v. Ofray-Campos, 534 F.3d 1, 17 (1st Cir. 2008) (describing the proper procedure); United States v. Rodriguez, 67 F.3d 1312, 1316 (7th Cir. 1995); 28 U.S.C. § 753(b).

## IV.

For the reasons stated above, we **AFFIRM** Neliza's convictions on Count I (conspiracy) and Count II (carjacking), **REVERSE** her conviction on Count III (carriage or use of a firearm during a crime of violence), and **REMAND** for resentencing.

**SO ORDERED**.

**– Concurring and Dissenting Opinion Follows –**

-39-

**TORRUELLA**, <u>Circuit Judge</u> (Concurring in part; Dissenting in part). My colleagues have written a cogent and well-reasoned opinion, much of which I agree with. However, because "we cannot affirm a criminal conviction on the basis of a theory not presented to the jury," I must dissent. <u>Chiarella</u> v. <u>United States</u>, 445 U.S. 222, 236 (1980).

To begin, I reprise the relevant facts. Alberto, Gabriel, and Neliza were indicted on the same charges and tried jointly.[25] There was enough direct and circumstantial evidence presented to the jury to permit it to find that Alberto and Gabriel took Pérez's car from his person by violence or intimidation, with the aid of a firearm, and that sometime after this "physical taking" they brought Pérez and his car to José's house for safekeeping.[26] <u>See</u> <u>Castro-Davis</u>, Nos. 08-2108, 08-2109. The evidence as to Neliza's involvement on the other hand, was not so clear. I agree with the majority that there was no evidence presented that would allow a jury to make a reasonable inference that Neliza was involved in the planning stages of the carjacking,

---

[25]Count I of the indictment charged defendants under 18 U.S.C. § 371 (conspiracy to commit carjacking), Count II under 18 U.S.C. §§ 2119(3) and 2 (aiding and abetting a carjacking resulting in death), and Count III under 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (using or carrying a firearm in connection with a carjacking).

[26]I will refer to "physical taking" as the time period during which the carjacker obtains possession of a motor vehicle while in the presence of another. In the present case, that "physical taking" ended once Pérez and his car were captured by the carjackers and one of them began to drive it.

or that she was involved at the "physical taking" of the car from Pérez's person.  See Maj. Op. at 9.

The evidence at trial instead showed that Neliza first became involved when she called her brother, José, and told him to step outside his home to receive Gabriel.  That phone call, however, did not establish that Neliza knew anything about the carjacking.  José testified that soon after receiving the call, he stepped outside to meet Gabriel.  His testimony was completely devoid of any mention of Neliza.  Conspicuously absent from the record was any inquiry from the government as to Neliza's whereabouts at this point in José's testimony.[27]  As the majority opinion makes clear, the first time there was any evidence that Neliza learned of the carjacking was many hours after the "physical taking" of Pérez and his car.[28]

---

[27]A reading of the trial transcript evinces copious use of the word "they" by both the prosecution and witnesses, with no attempt made to clarify whether "they" referred to Alberto, Gabriel and Neliza; Alberto and Gabriel; or some other combination of the three.  In fact, when José testifies that Gabriel and Alberto brought Pérez to the house, the prosecutor does not ask whether Neliza (who José had testified had called him to come out of his house to receive Gabriel) also came with Alberto and Gabriel.  Instead, the prosecutor next asks José: "Okay.  So you were told that Gabby and whoever were going to an ATM machine . . . ." (emphasis added).  As the majority points out, the government seems to have chosen the same strategy on this appeal, referring to appellants generically as "appellants" and not individually. Maj. Op. at 9 n.7.

[28]All the evidence points to the "physical taking" taking place in the early hours of the afternoon.  José testified that it was "getting dark" when Neliza called.  The official record of the Astronomical Applications Department of the U.S. Navy indicates

-41-

As the majority well-states the law, a person cannot be found guilty of aiding and abetting a crime that already has been committed.  See SEC v. Papa, 555 F.3d 31, 36 (1st Cir. 2009); see also Maj. Op. at 6-7.  Similarly for conspiracy.  See United States v. O'Campo, 973 F.2d 1015, 1021 (1st Cir. 1992) ("Under the doctrine of Pinkerton v. United States, 328 U.S. 640, 645-46 (1946), a defendant co-conspirator may be held responsible for a substantive crime committed by another conspirator in furtherance of the conspiracy if that crime is committed while the defendant co-conspirator is a member of the conspiracy." (emphasis added)).

The issue here is therefore about timing.  Since Neliza's involvement could only be found by a reasonable jury after the "physical taking" of Pérez and his car took place, her conviction must be overturned unless the offense of carjacking continued until the time when Neliza first became involved.  The majority holds that the law of this circuit is such that the offense conduct of carjacking in this case was still ongoing after the "physical taking" since Alberto and Gabriel remained in control of the victim Pérez and his car.  It thus concludes that there was sufficient evidence presented to the jury to convict Neliza based on the

that sundown was at 7:04 pm on July 15, 2006.  Naval Oceanography Portal: Sun Or Moon Rise/Set Table for One Year: U.S. Cities and Towns at http//www.usno.navy.mil/USNO/astronomical-applications/ data-services/rs-one-year-us (last visited June 15, 2010).  At least three hours, and probably closer to five hours passed between the "physical taking" and Neliza's involvement.

theory that the offense conduct of carjacking is ongoing so long as "the carjacker maintains control over the victim and [his or her] car."  See Maj. Op. at 24 (quoting Ramírez-Burgos, 313 F.3d at 30 n.9).

I do not disagree with the majority's reading of our case law, although I have serious reservations about the correctness of the abduction rule.  First, as the majority explains, the abduction rule was grounded on a case that does not actually support it.  See Ramírez-Burgos, 313 F.3d 23, 30 n.9 (1st Cir. 2002)(citing United States v. Vázquez-Rivera, 135 F.3d 172, 178 (1st Cir. 1998) (Torruella, C.J.) for the proposition that "the commission of a carjacking continues at least while the carjacker maintains control over the victim and her car."); see also Maj. Op. at 21 n.12.  We appear to have mechanically repeated this phrase in subsequent opinions without explanation.  See, e.g., United States v. Lebrón-Cepeda, 324 F.3d 52, 61 (1st Cir. 2003); United States v. Matos-Quiñones, 456 F.3d 14, 19 n.4 (1st Cir. 2006); United States v. Martínez-Bermúdez, 387 F.3d 98, 101 (1st Cir. 2004).

Second, the abduction rule shifts the issue from a causal analysis of whether serious bodily injury (§ 2119(2)) or death (§ 2119(3)) results (is causally connected to) to an inquiry that mechanically ends when the carjacker releases the victim and her car.  See Ramírez-Burgos, 313 F.3d at 30.  In my view, this is a misreading of the statute.  As the majority explains, the word

-43-

"results" merely indicates a causal connection, one not necessarily circumscribed by the time when the offense conduct of the carjacking ends. As an example, it seems clear that if a defendant took a car, shot the victim in the process, and abandoned the car an hour later, we would not say the crime was ongoing over the course of the three weeks it took for the victim to languish in the hospital and die. It also seems clear that in that situation, the carjacker could be convicted under the plain language of § 2119(3). However, under our current abduction rule, he might not be.

Finally, and as relevant later, I do not see where the abduction rule is in any way supported by the plain language of the statute,[29] whether by a plain and commonsensical definition of the word "take" -- "to get into one's hands or into one's possession, power or control by force or stratagem"[30] -- or as derived from the common law of robbery and larceny. It is not apparent to me why a reasonable person would read the carjacking statute and believe

---

[29]18 U.S.C. § 2119(3) reads:

> Whoever with the intent to cause death or serious bodily harm <u>takes a motor vehicle</u> that has been transported, shipped, or received in interstate or foreign commerce <u>from the person or presence of another by force and violence or by intimidation, or attempts to do so</u>, shall . . . if death results, be fined under this title or imprisoned, any number of years up to life, or both, or sentenced to death.

(emphasis added).

[30]Webster's Third New International Dictionary Unabridged 2329 (1976).

-44-

that the "taking" of a car under the statute continues while the carjacker maintains control over the victim and his or her car. I simply do not see how a reasonable person would assume that "tak[ing] a motor vehicle . . . from the person or presence of another by force and violence or by intimidation," § 2119(3), is an act that continues past the moment when the carjacker has obtained (i.e., already taken) clear possession (in this case, sometime before Alberto and Gabriel arrived at José's house).

While I concur with the majority's analysis of our current law and join in calling for the en banc court to correct this error promptly, I nevertheless cannot join their conclusion.[31] Although it may well be the law of our circuit, the abduction rule theory was never presented to the jury as a basis of conviction. Indeed, the jury was told they could convict on the basis of what the majority calls "pure conjecture." See Chiarella v. United States, 445 U.S. at 236 (finding that "we cannot affirm a criminal conviction on the basis of a theory not presented to the jury"); Cola v. Reardon, 787 F.2d 681, 693 (1st Cir. 1986) (holding that it is in violation of due process to affirm a conviction on a basis neither set forth in the indictment nor presented to the jury at trial); see also Dunn v. United States, 442 U.S. 100, 106 (1979) (holding that "[t]o uphold a conviction on a charge that was

---

[31]I do, however, join the majority's conclusion that there was no evidence to support the gun charge against Neliza.

neither alleged in the indictment nor presented to a jury at trial offends the most basic notions of due process.").

At closing arguments, the government asked the jury to infer that Neliza was involved at the time of the physical taking of the vehicle from Pérez, arguing that it had been Neliza who drove Gabriel and Alberto to the site of the carjacking because "[s]omeone had to keep a gun on [Pérez]" or he would have escaped. The government presented no evidence to support this theory nor did it posit any other theory under which the jury should find Neliza guilty. The jury was never told that Neliza could be legally convicted even if the jury found that she first learned of the carjacking after the "physical taking" had occurred, while Alberto and Gabriel maintained control over Pérez and his car. See Ramírez-Burgos, 313 F.3d at 30 n.9. Significantly, the government never argued the "abduction rule" as the law of the circuit, neither at trial nor in its appellate brief.[32] Instead, the government asked the jury to infer from the evidence presented that Neliza was involved in the "physical taking" of the carjacking, or possibly even before it, and that she must have known there was a gun being used on Pérez. The majority finds correctly that this

---

[32]Indeed, the government's appellate brief cites most of the cases the majority discusses as setting out the abduction rule, but it cites them for the issue of whether sufficient evidence was presented as to the conditional intent to cause serious bodily harm or death. See Gov't Brief at 21-23. Naturally, Neliza also did not raise this theory at trial or on appeal.

theory was "pure conjecture" and that there was not sufficient evidence for a reasonable jury to convict Neliza based on this theory. See Maj. Op. at 9.

The instructions given to the jury were also unclear as to the temporal bounds of the offense conduct of carjacking, never specifying that the offense conduct included the time after the "physical taking" and that as such, Neliza could be convicted if the jury found she was involved after Pérez and his car arrived to José's house. Specifically, the jury was instructed that they should convict if they found that the defendants either conspired or aided and abetted each other in "taking Mr. Pérez's Mazda by force and intimidation with intent to cause death and serious bodily harm by force, violence, and intimidation, and actually resulting in death." The instructions were not improper as to the elements, they essentially mirrored the carjacking statute. However, they did not clarify what those elements meant. The instructions left up to the mind of the jury to define "taking" in what I view as an unsupportable extension -- that is, as including the conduct of defendants after they arrived at José's house. By not defining our case law on the subject of carjacking and not specifying that the act of carjacking in this case would legally continue up until the moment that the carjackers lost control of the victim or his car, and because this is by no means an obvious or natural interpretation of the instructions, the only inference

-47-

we have left is that the jury convicted Neliza on the government's theory at trial which the majority now finds to be insufficient to sustain her conviction.

"The Supreme Court has ruled that where a jury is given the option of choosing between factually adequate and factually inadequate theories of guilt, jurors 'are well equipped to analyze the evidence' and can be counted upon to base their verdict upon the factually adequate theory." Santellan v. Cockrell, 271 F.3d 190, 196 (5th Cir. 2001) (citing Griffin v. United States, 502 U.S. 46, 59 (1991)). However, that is not the case here. Here the jury was given one theory of guilt: that Neliza was present at the moment of the "physical taking." The jury was never told the theory that the majority now uses to affirm her conviction: that Neliza was involved after the "physical taking" but while the carjackers remained in control of Pérez and his car. That a jury might have "divined [this] theory from the facts" and from the law as read to them in the jury instructions is not sufficient. Cola, 787 F.2d at 699 n.19. "The problem with th[at] view . . . is the serious risk involved that the jury did not so divine the appellate theory, and instead, that it convicted based on the erroneous or noncriminal theories before it." Id. Barring any kind of explanation as to the law of our circuit explaining the abduction rule, I simply do not see how a jury might have divined it.

I view this case as analogous to the Supreme Court's decision in Chiarella. 445 U.S. 222. In that case, the employer of a financial printer engaged to print corporate takeover bids was convicted based on his purchase of stock in target companies without informing its shareholders of his knowledge of proposed takeovers. Id. at 224-25. The Supreme Court held that his conduct did not violate the Securities Exchange Act and thus his conviction was improper. Id. at 224-35. In its brief to the Court, the government for the first time offered an alternative theory to support the conviction, arguing that petitioner's conviction could be affirmed on the basis that he owed a duty to the corporation that had hired the printing company. Id. at 235.[33] The Supreme Court reaffirmed the maxim that "we cannot affirm a criminal conviction on the basis of a theory not presented to the jury," and held that the jury instructions and the government's theory at trial showed that the jury had convicted on the theory of petitioner's failure to disclose to shareholders, and not on a duty owed to anyone else. Id. at 236.

Similarly in our previous decision in Cola, 787 F.2d 681, we granted habeas because the defendant had no notice at trial of the theory which was eventually used by the state appeals court to uphold his conviction. Citing to Dunn, 442 U.S. 100, and granting

[33]I note that the government in this case has not brought up the abduction rule at any point in these proceedings.

habeas, we worried about the "sixth amendment problems of whether defendants have ever been presented with an opportunity to confront, in a fact-finding forum, the government's final theory of guilt" and noted that it was "not clear whether an opportunity has been provided to have guilt determined by a jury in the first instance [on that theory]." Cola, 787 F.2d at 701. Just like in Dunn, our court found that "the prosecution in Cola's trial did not build its case on the evidence supporting the appellate theory," and rejected the assumption "that the jury would somehow divine, and independently articulate, the appellate theory." Id. at 700; Dunn, 442 U.S. at 106 ("[W]hile there was no variance between the indictment and proof at trial, there was a discrepancy between the basis on which the jury rendered its verdict and that on which the Court of Appeals sustained petitioner's conviction.").

That there was evidence presented sufficient to convict Neliza as an accessory after the fact under 18 U.S.C. § 3, there is no doubt in my mind.[34] However, the government did not charge Neliza as an accessory after the fact. Neliza was charged in the same way as Alberto and Gabriel: as an aider and abettor and conspirator to carjacking and to carrying a firearm during a carjacking. The firearm charge proved to be patently baseless, and

_____

[34]Neliza can also be properly charged in the Commonwealth courts for the various state crimes which, if proven by proof beyond a reasonable doubt, could very well result in her conviction for several serious felony offenses.

a directed verdict should have been entered by the district court upon Neliza's Rule 50 motion.  We correct that error now and I fully join the majority in its decision as to that charge.  But because the majority upholds Neliza's conviction on a theory which was never presented to the jury, I cannot join in upholding her conviction as to the other two counts.